FIRST DIVISION
FILED: January 24, 2011

No. 1-11-0033

| | | |
|---|---|---|
| WALTER P. MAKSYM and THOMAS L. McMAHON, | ) ) | APPEAL FROM THE CIRCUIT COURT OF COOK COUNTY |
| Petitioners-Appellants, | ) ) ) | |
| v. | ) ) | No. 2010 COEL 020 |
| THE BOARD OF ELECTION COMMISSIONERS OF THE CITY OF CHICAGO, et al., (RAHM EMANUEL, | ) ) ) ) ) | HONORABLE MARK J. BALLARD, |
| Respondent-Appellee). | ) | JUDGE PRESIDING. |

_____


        JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
        Presiding Justice Hall concurred in the judgment and opinion.
        Justice Lampkin dissented, with opinion.

**OPINION**

        The petitioners, Walter P. Maksym, Jr., and Thomas L. McMahon, filed written objections to the candidacy of the respondent, Rahm Emanuel (the candidate), who seeks to be a candidate for Mayor of the City of Chicago in the Municipal General Election to be held on February 22, 2011.  After an evidentiary hearing, the Board of Election Commissioners of the City of Chicago (the Board) dismissed the objections and ruled that the candidate was entitled to have his name included on the ballot as a mayoral candidate.  The petitioners sought judicial review in the circuit court of Cook County, which confirmed the decision of the Board.  The petitioners now appeal.  For the reasons that follow, we reverse the circuit court's judgment, set aside the Board's decision, and order that

the candidate's name be excluded (or, if necessary, removed) from the ballot for Chicago's February 22, 2011, mayoral election.

Although the parties engaged in an extensive evidentiary hearing prior to the Board's decision, the pertinent facts are largely undisputed on appeal. It suffices for our purposes to summarize and adopt the hearing officer's factual findings, which the Board adopted and which we hereinafter refer to as the Board's findings. In so doing, we conclude that those findings were not against the manifest weight of the evidence. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210, 886 N.E.2d 1011 (2008).

The candidate was born in Chicago and, in December 1998, purchased a Chicago home (the Hermitage house), which he still owns. The candidate lived with his family in that home from 1998 through January 2009. On January 2, 2009, the candidate, who had up to then served as a member of the United States House of Representatives elected from the district that included the Hermitage house, resigned his office in order to serve in Washington, D.C., as Chief of Staff to the President of the United States. After traveling to Washington, D.C., he and his spouse purchased additional land adjoining their Chicago property.

From January through May 2009, the candidate lived in an "in-law apartment" in Washington, D.C., while his family remained in the Hermitage house. From June 2009 until October 1, 2010, the candidate, and his family, lived in a Washington, D.C., house (the

Woodley House) that was leased for the term spanning June 1, 2009, through June 30, 2011. The family received their mail at the Woodley house and moved most of their clothes and personal belongings to Washington, D.C. They did, however, leave behind at the Hermitage house several larger household items, including televisions, a piano, and a bed, as well as several personal possessions such as family heirlooms and books. The candidate's Hermitage house was leased to another family for the term of September 1, 2009, through June 30, 2011.

At all relevant times, including the time he was in Washington, D.C., the candidate continued to pay property taxes for the Hermitage house, continued to hold an Illinois driver's license listing the Hermitage house as his address, continued to list the Hermitage house address on his personal checks, and continued to vote with the Hermitage house as his registered voting address. He did, however, pay income tax in 2009 and 2010 to both Washington, D.C., and Illinois.

On October 1, 2010, the candidate resigned his position of Chief of Staff to the President of the United States and entered into a lease to live in an apartment located on Milwaukee Avenue in Chicago from October 1, 2010, through June 30, 2011. He has lived in that apartment since October 1, 2010. In his testimony, the candidate explained that he had always expected to serve as Chief of Staff to the President for approximately 18 to 24 months before returning to live in the Hermitage house.

3

No. 1-11-0033

From these facts, the Election Board concluded that the candidate met the qualification for candidacy, contained in subsection 3.1-10-5(a) of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/3.1-10-5(a) (West 2008)), mandating that he have "resided in" Chicago for the one year preceding the February 22, 2011 mayoral election. The Board based this conclusion on the evidence that the candidate maintained significant contacts with Chicago, intended to return to Chicago and to the Hermitage house, and had lived in Washington, D.C., solely for the purpose of working for the President. The petitioners filed a petition for judicial review in the circuit court, and, following the circuit court's confirmation of the Board's decision, they now appeal.

The standards for our review of an electoral board decision mirror those applicable to review of an administrative agency decision. *Cinkus*, 228 Ill. 2d at 209-10. Thus, for any given issue, our standard of review, which embodies the level of deference we afford the agency on that issue, depends on whether the issue is one of law, one of fact, or a mixed question of law and fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390, 763 N.E.2d 272 (2001). An electoral board's decisions on questions of law are not binding on a reviewing court, which will review such questions under the nondeferential *de novo* standard. *Cinkus*, 228 Ill. 2d at 210-11. An electoral board's findings of fact, however, are deemed *prima facie* true and correct and will not be overturned on appeal unless

4

they are against the manifest weight of the evidence. *Cinkus*, 228 Ill. 2d at 210; 735 ILCS 5/3-110 (West 2008). An electoral board's rulings on mixed questions of law and fact--questions on which the historical facts are admitted, the rule of law is undisputed, and the only remaining issue is whether the facts satisfy a statutory standard with which the Board has expertise--will not be disturbed on review unless clearly erroneous. *Cinkus*, 228 Ill. 2d at 211.

The issues in this appeal distill essentially to two: whether the candidate meets the Municipal Code's requirement that he have "resided in the municipality at least one year next preceding the election" (65 ILCS 5/3.1-10-5(a) (West 2008)), and, if not, whether he is exempt from that requirement under the Election Code provision stating that "no elector *** shall be deemed to have lost his or her residence *** by reason of his or her absence on business of the United States" (10 ILCS 5/3-2 (West 2008)). Each of these issues presents, first, a legal question requiring construction of the relevant statutory provisions, and, second, assuming the Board applied the correct standard (see *Du Page County Airport Authority v. Department of Revenue*, 358 Ill. App. 3d 476, 498 n.4, 831 N.E.2d 30 (2005)), a mixed question of law and fact regarding the Board's application of that standard. We review the legal questions *de novo* and any mixed questions under the clearly erroneous standard.

We begin by analyzing the statutory requirements to be a candidate for municipal office, which are located in subsection

5

3.1-10-5(a) of the Municipal Code:

> "A person is not eligible for an elective municipal office unless that person is a qualified elector of the municipality and has resided in the municipality at least one year next preceding the election or appointment ***." 65 ILCS 5/3.1-10-5(a) (West 2008).

In its decision, to determine whether the candidate met the Municipal Code's requirement that he have "resided in" the municipality for one year, the Board applied the test for residency that has been used for voter qualification under the Election Code. This approach is supported by several appellate court decisions that, without discussion, equate residency requirements imposed on voters with requirements that a candidate "resided in" his or her political unit. See *e.g.*, *People ex rel. Madigan v. Baumgartner*, 355 Ill. App. 3d 842, 847-48, 823 N.E.2d 1144 (2005) (stating only that it would treat the terms as synonymous "because eligibility to run for office is closely linked to the ability to vote within a particular jurisdiction"); *Walsh v. County Officers Electoral Board of Cook County*, 267 Ill. App. 3d 972, 976, 642 N.E.2d 843 (1994) (assuming implicitly that the terms were synonymous); *Delk v. Board of Election Commissioners of the City of Chicago*, 112 Ill. App. 3d 735, 738, 445 N.E.2d 1232 (1983).

Neither the Board nor the parties have, however, referred us to any supreme court opinion ratifying, adopting, or directly addressing this approach. The only cited supreme court case to

approach the issue is *Smith v. People ex rel. Frisbie*, 44 Ill. 16 (1867), a *quo warranto* action decided under the presumption that the candidate had a right to the office to which he had been appointed and in which the court required the objectors to establish the candidate's disqualification by "clear and satisfactory" proof. See *Smith*, 44 Ill. at 24-25. We know of no similar presumption applicable to this case, and the objectors here bore the less stringent burden to prove the candidate's disqualification by a preponderance of the evidence. See Board of Election Commissioners of the City of Chicago, Rules of Procedure 10 ("[T]he objector must bear the burden of proving by operation of law and by a preponderance of the *** evidence *** that the objections are true.").

In addition, although the supreme court's discussion in *Smith* was based nominally on principles of "residence," it appears from its analysis that it actually applied concepts of domicile. Despite the facts that the officeholder had left Illinois with his family and had rented out his Illinois home, the supreme court concluded, based solely on the officeholder's intent to return, that he retained his "residence" in Illinois. See *Smith*, 44 Ill. at 24-25. This intent-based analysis is the defining characteristic of the principle of domicile, a legal status that, once acquired, can be "retained, *animo solo*, by the mere intention not to change it and adopt another." *Hayes v. Hayes*, 74 Ill. 2d 312, 314 (1874). Since *Smith* was decided, however, our supreme

7

court has explained unequivocally that "it is elemental that domicile and residence are not synonymous." *Pope v. Board of Election Commissioners*, 370 Ill. 196, 202, 18 N.E.2d 214 (1938). As the supreme court further explained in *Pope*, the legal concept of "residence" requires a permanent abode. *Pope*, 370 Ill. at 200. Accordingly, to the extent that *Smith* might establish that a voter or candidate could meet a residency requirement through intent alone, without any permanent abode, the supreme court has since abandoned *Smith*'s approach. For this reason, along with the above-discussed reasons, we do not view *Smith* as controlling this case.

Aside from *Smith*, the candidate urges that the test to be applied in determining whether he has resided within Chicago for one year prior to the February 22 mayoral election is the same as the test for determining residency under the Election Code. He bases this argument, in part, upon the assertion that the Election Code and the Municipal Code should be interpreted *in pari materia*. See *Cinkus*, 228 Ill. 2d at 218-19. The doctrine of *in pari materia*, however, does not dictate that terms in separate statutes be given identical meanings; it dictates only that separate statutes bearing on the same subject matter be given harmonious interpretation. *E.g.*, *Gerard v. White*, 356 Ill. App. 3d 11, 17, 826 N.E.2d 517 (2005). We, therefore, do not view the doctrine of *in pari materia* as a bar to distinguishing the Election Code's residency requirement from the Municipal Code's one-year "reside in" requirement for candidates. In fact, as we discuss below, we

8

view the doctrine, which is actually an outgrowth of the more general rule that courts should consider statutory provisions in light of the entire relevant statutory scheme (*Gerard*, 356 Ill. App. 3d at 17), as support for our conclusion that the requirements of the Election Code and the Municipal Code, although distinguishable, may nevertheless be read in harmony.

The supreme court has not directly addressed the notion that the legislature intended the Municipal Code's one-year "reside in" requirement for candidates to coextend with the residency requirement for voters, but the court has at least once noted the distinction between candidate and voter residency requirements. In *People ex rel. Moran v. Teolis*, 20 Ill. 2d 95, 169 N.E.2d 232 (1960), a party argued that a voter residency requirement should be extended based on the policy embodied by a precursor to the Municipal Code section now at issue, which provided, as it provides now, that a candidate for municipal office be a qualified elector and have resided in the area at least one year preceding the election. *Moran*, 20 Ill. 2d at 104 (discussing Ill. Rev. Stat. 1957, ch. 24, par. 9-87). The supreme court answered that the statute "differentiate[d] between 'electors' and those persons who may qualify for municipal office." *Moran*, 20 Ill. 2d at 104.

With the exception of *Smith*, which we have already distinguished, the supreme court has limited its analysis of residency requirements to voter qualification cases. See *Clark v. Quick*, 377 Ill. 424, 426-27, 36 N.E.2d 563 (1941) ("residence *for*

*voting purposes* means an actual place of abode" (emphasis added); " 'a real and not imaginary abode, occupied as his home or dwelling, is essential to satisfy the legal requirements as to the residence *of a voter*' " (emphasis added)); *Coffey v. Board of Election Commissioners of East St. Louis*, 375 Ill. 385, 387, 31 N.E.2d 588 (1940) ("[a] residence, *for voting purposes*, is not lost by temporary removal with the intention to return" (emphasis added)); *Park v. Hood*, 374 Ill. 36, 43, 27 N.E.2d 838 (1940) ("[a] real and not an imaginary abode, occupied as his home or dwelling, is essential to satisfy the legal requirements as to the residence *of a voter*" (emphasis added)); *Pope*, 370 Ill. at 198-99 ("The determination of this question requires a review of the qualifications *for registration and voting*" (emphasis added)); *Anderson v. Pifer*, 315 Ill. 164, 146 N.E. 171 (1924) ("Whether a college student is entitled *to vote*" based on residence is a question of fact (emphasis added)). Consequently, we have neither a current supreme court directive, nor persuasive appellate court reasoning, compelling us to treat candidate residency requirements in the same manner as voter residency requirements, and we have some indications from the supreme court that the requirements might diverge. We must, therefore, ourselves interpret the Municipal Code's use of the phrase "resided in" to determine if it should be construed as being synonymous with, or different from, the Election Code's residency requirements for voters.

We begin this task by resort to familiar principles of

10

statutory interpretation.  For a court interpreting a statute, the primary goal is to ascertain and give effect to the intention of the legislature, and the best indicator of that intent is the statute's language, given its plain and ordinary meaning.  *Cinkus*, 228 Ill.2d at 216.

As noted, the operative language at issue requires that a potential candidate have "resided in" the municipality for one year next preceding the election.  In its verb form, "reside" generally means, among other things, "to dwell permanently or continuously," or to "have a settled abode for a time."  Webster's Third New International Dictionary 1931 (1993).  The word is considered to be synonymous with "live, dwell, sojourn, lodge, stay, put (up), [and] stop," but it "may be the preferred term for expressing the idea that a person keeps or returns to a particular dwelling place as his fixed, settled, or legal abode."  Webster's Third New International Dictionary 1931 (1993).

These definitions are not interchangeable for our purposes: our selection of the synonym "live" as a fair definition of "resided in" would defeat the candidate's eligibility to run for office, because he most certainly "lived" outside Chicago for a large part of the statutory one-year period. On the other hand, our selection of a conception of "resided in" more akin to the idea of a permanent abode a person keeps or to which he plans to return-- the definition the Board seems to have employed--would lend much greater support to the candidate's position.  The question for us,

then, becomes which of these definitions the legislature meant to invoke with its use of the phrase "reside in" in the Municipal Code.

In interpreting a statute, a court should consider, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought by the law. *People v. Donoho*, 204 Ill. 2d 159, 171-72, 788 N.E.2d 707 (2003). Our research into legislative purpose reveals that candidate "reside in" qualifications of the type now at issue date to our State's first constitution, which imposed upon candidates for the offices of state representative and senator the requirement that they have "resided" within the area for 12 months (or one year) prior to their election and imposed upon lieutenant governor candidates the requirement that they have "resided" within the State for two years preceding their election. See Ill. Const. 1818, art. II, §2, §6; Schedule §13. Similar "reside in" qualifications have appeared, both in Illinois' constitutions and in its statutes, since 1818. See *e.g.*, Ill. Const. 1848, art. III, §3, §4; 1861 Ill. Laws 267; 1917 Ill. Laws 258.

Although it lacks precedential force (see *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 95, 672 N.E.2d 1207 (1996)), the decision in *People v. Ballhorn*, 100 Ill. App. 571, 573 (1901), provides what we view as a reasonable interpretation of the purpose underlying such candidate "reside in" requirements. *Ballhorn* explains that those requirements ensure "that those who

represent the local units of government shall themselves be component parts of such units." *People v. Ballhorn*, 100 Ill. App. 571, 573 (1901). As *Ballhorn* further explains, requirements that candidates "reside in" the area they would represent "can only be truly served by requiring such representatives to be and remain actual residents of the units which they represent, in contradistinction from constructive residents. A mere constructive resident has no better opportunities for knowing the wants and rightful demands of his constituents, than a non-resident, and is as much beyond the wholesome influence of direct contact with them. *** In [the candidate residency statute] the language is not, shall be a resident, but it is, shall 'reside within' ***." *Ballhorn*, 100 Ill. App. at 573. Although nearly 200 years of technological advances since Illinois' first candidate "reside in" requirements may have obviated much of their necessity, the legislature has not seen fit to alter the relevant language. We believe, therefore, that the initial purpose of the "reside in" requirement for candidates, and the failure of the legislature to alter that language in the current Municipal Code, strongly indicates that the phrase "resided in" as used in the Municipal Code requires actual, not constructive, residence.

Another familiar principle of statutory interpretation teaches that a "statute should be evaluated as a whole, with each provision construed in connection with every other section." *Cinkus*, 228 Ill. 2d at 216-17. For our purposes, this maxim requires that we

13

consider not only subsection 3.1-10-5(a) of the Municipal Code, but also any other relevant portions of the statute.

Subsection 3.1-10-5(a) of the Municipal Code sets forth two qualifications for candidates: it states that a candidate must be "a qualified elector of the municipality and [must have] resided in the municipality at least one year next preceding the election." 65 ILCS 5/3.1-10-5(a) (West 2008). These two qualifications are stated separately and in the conjunctive.

The first part of the conjunctive--the "qualified voter" requirement--invokes the qualifications for electors stated in sections 3-1 and 3-2 of the Election Code. See 10 ILCS 5/3-1, 3-2 (West 2008). In pertinent part, those statutes provide as follows:

"§ 3-1. Every person *** who has resided in this State and in the election district 30 days next preceding any election therein *** and who is a citizen of the United States, of the age of 18 or more years is entitled to vote at such election for all offices and on all propositions." 10 ILCS 5/3-1 (West 2008).

and

"§ 3-2. (a) A permanent abode is necessary to constitute a residence within the meaning of Section 3-1. No elector or spouse shall be deemed to have lost his or her residence in any precinct or election district in this State by reason of his or her absence on business of the United States, or of this State." 10 ILCS 5/3-2(a) (West 2008).

14

No. 1-11-0033

In *Park v. Hood*, our supreme court held:

> "It is well settled that the terms 'residence' and 'permanent abode,' as employed in [the Election Code], are synonymous. [Citations.] A real and not an imaginary abode, occupied as his home or dwelling, is essential to satisfy the legal requirements as to the residence of a voter. One does not lose residence by temporary removal with the intention to return, or even with a conditional intention of acquiring a new residence, but when one abandons his home and takes up his residence in another county or election district, he loses his privilege of voting in the district from which he moved. [Citations.] The question of residence is largely one of intention, and a voter is competent to testify as to his intention, although such testimony is not necessarily conclusive." *Park*, 374 Ill. at 43.

From the admitted facts in this case, we find that the candidate clearly satisfied the qualifications to be an elector for the February 22, 2011, municipal election. Without addressing the question of whether the Hermitage house constituted the candidate's permanent place of abode while it was under lease, we conclude that the candidate clearly falls within the exception to section 3-1 articulated in subsection 3-2(a) (see *Pope*, 370 Ill. at 199); namely, that he absented himself from the City of Chicago on business of the United States and therefore did not lose the voter residency status that he had theretofore established in Chicago.

15

No. 1-11-0033

Having determined that the candidate satisfies the requirement to be an elector, we must still address the question of whether he has "resided in" the City of Chicago for at least one year next preceding the February 22, 2011, mayoral election; the second requirement for candidacy. 65 ILCS 5/3.1-10-5(a) (West 2008).

As we have observed, the "reside in" requirement is stated separately from, and in addition to, the requirement that he be a qualified elector of Chicago in order to be a candidate for municipal office. The fact that the two requirements are stated separately and in the conjunctive leads to the inference that the legislature intended that they be considered separately from, and in addition to, each other.

This inference is bolstered by language from the remainder of section 3.1-10-5. Subsection 3.1-10-5(d) provides that:

"If a person (i) is a resident of a municipality immediately prior to the active duty military service of that person or that person's spouse, (ii) resides anywhere outside of the municipality during that active duty military service, and (iii) immediately upon completion of that active duty military service is again a resident of the municipality, then the time during which the person resides outside the municipality during active duty military service is deemed to be time during which the person is a resident of the municipality for purposes of determining the residency requirement under subsection (a)." 65 ILCS 5/3.1-10-5(d)

16

(West 2008).

For the point that the Municipal Code's "reside in" requirement is separate from the residency requirement for an elector, we find particularly interesting subsection 3.1-10-5(d)'s concluding language that its exception applies "for purposes of determining the residency requirement under subsection (a)." Subsection 3.1-10-5(a) contains only one explicit residency requirement: that a candidate have "resided in the municipality for one year." Thus, subsection 3.1-10-5(d)'s reference to "the residency requirement under subsection (a)" must refer to the explicit one-year candidate residency requirement contained in subsection 3.1-10-5(a) and not the voter residency requirements set forth in sections 3-1 and 3-2 of the Election Code.

Additionally, subsection 3.1-10-5(d), which we quote above, uses the words "resident" and "reside" to different effect. The subsection uses the word "resident" first to describe the concept of legal residence, by referring to a military serviceperson who "is a resident of a municipality." Just after that reference, however, the subsection uses the word "reside" to refer to the serviceperson's act of "resid[ing] anywhere outside of the municipality." This usage of the word "reside" does not denote the concept of legal residence, but rather the act of actually living somewhere outside the municipality.

Our interpretation that, in using the phrase "resides anywhere outside of the municipality" in subsection 3.1-10-5(d), the

17

legislature intended to refer to the act of living somewhere outside the municipality is further supported by the wording of the very next clause of that subsection. The clause refers to a person becoming "*again* a resident of the municipality" (emphasis added) upon his or her return after military service. If the military serviceperson must "again" become a resident of the municipality, then it logically follows that the person lost his or her resident status at some time prior thereto. The only manner in which subsection (d) contemplates a person losing residency status is by living outside of the municipality. Thus, subsection 3.1-10-5(d) assumes that a person who is absent from a municipality will not meet the "reside in" requirement of subsection 3.1-10-5(a), but, by reason of the provisions thereof, a compliant military serviceperson is *deemed* to have been a resident during the period of absence.

Basic rules of statutory construction provide that "where the same words appear in different parts of the same statute, they should be given the same meaning unless something in the context indicates that the legislature intended otherwise." *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 513, 702 N.E.2d 545 (1998). Under this rule, the fact that the legislature used the word "reside" to mean actually live in subsection 3.1-10-5(d) of the Municipal Code strongly indicates that it intended the same meaning in subsection (a).

The candidate resists this interpretation by arguing that

18

subsection 3.1-10-5(d) "addresses the situation in which a service member *** abandons his municipal residence and establishes residence elsewhere." We have two difficulties with the candidate's reading of subsection (d). Our first difficulty is that it would interpret the statute to apply to an almost imperceptibly narrow class of individuals; namely, those servicepeople who somehow establish full legal residency, that is, a permanent place of abode outside the municipality, then, after having formed an intent to remain outside the municipality, take the first opportunity to return. Our interpretation of the subsection, on the other hand, would have it apply in the logically feasible, and presumably quite common, situation in which a serviceperson's duty draws him or her from the municipality, and, immediately upon completion of his or her military assignment, the serviceperson returns.

Our second difficulty with the candidate's reading of subsection 3.1-10-5(d) is that it is belied by the legislative history underlying the subsection. During debate for the senate bill whose passage added subsection (d) to section 3.1-10-5 of the Municipal Code (see 95th Gen. Assem., Senate Bill 253, 2007 Sess.), Senator Luechtefeld, one of the senators who presented the bill, explained the original version as follows:

"Senate Bill 253 provides that if a person meets all the requirements necessary to run for municipal office, but their time as an active duty member of the military interrupted the

19

residency requirement, they shall be permitted to run for that office. A *** situation occurred in my district where an individual was in Iraq and *** he came back, wanted to run for municipal office, but did not meet the one-year residency requirement. This would simply allow them to come back to that same district, the same ward, and run as if they had been there." 95th Gen. Assem., Senate Proceedings, Marcy 29, 2007, at 13 (statements of Senator Luechtefeld).

Senator Luechtefeld described the final version of the bill in similar terms:

"If you'll remember, I had a bill that we passed unanimously out of here to allow a person to go into the military and *** be gone maybe a year or two and then come back to a community and run for office, that he would not lose his eligibility because of residency. The House has changed the bill a little bit, but it passed over there unanimously also." 95th Gen. Assem., Senate Proceedings, May 31, 2007, at 37-38 (statements of Senator Luechtefeld).

This legislative history supports our interpretation that subsection 3.1-10-5(d) of the Municipal Code uses the word "reside" to mean actually live rather than having legal voting residence, and it further undercuts the candidate's argument to the contrary.

Based on the foregoing analysis, we conclude that, under subsection 3.1-10-5(a) of the Municipal Code, a candidate must meet not only the Election Code's voter residency standard, but also

must have actually resided within the municipality for one year prior to the election, a qualification that the candidate unquestionably does not satisfy. Because the candidate does not satisfy that standard, he may be eligible for inclusion on the ballot only if he is somehow exempt from the Municipal Code's "reside in" requirement.

To that end, the candidate argues that, regardless of whether he meets the candidate eligibility requirements of subsection 3.1-10-5(a) of the Municipal Code, he nonetheless may be qualified as a candidate by virtue of section 3-2 of the Election Code, which provides as follows:

"(a) A permanent abode is necessary to constitute a residence within the meaning of Section 3-1. No elector or spouse shall be deemed to have lost his or her residence in any precinct or election district in this State by reason of his or her absence on business of the United States, or of this State." 10 ILCS 5/3-2 (West 2008).

According to the candidate, he falls within this exception because his absence from Chicago was attributable to his service as the Chief of Staff to the President of the United States. We agree with the candidate that his service constituted "business of the United States" and thus that this exception applies to him. We disagree, however, with his position that the exception saves his candidacy. In our view, the exception embodied by section 3-2 of the Election Code applies only to voter residency requirements, not

21

to candidate residency requirements.

We base this conclusion largely on the plain language of the Election Code. That plain language limits the reach of the "business of the United States" exception to "elector[s]" or their spouses; it makes no mention of "candidates." Further, as we have noted, we must interpret statutes "as a whole, with each provision construed in connection with every other section." *Cinkus*, 228 Ill. 2d at 216-17. Section 3-2's "business of the United States" exception is housed not only in the Election Code, but in a portion of the Election Code dealing exclusively with voter qualification, in fact in an Article titled "Qualification of Voters." See 10 ILCS 5/3-1 through 3-5 (West 2008). As explained above, the Municipal Code sets forth two qualifications for candidates: they must meet the Election Code's standards for a "qualified voter," and they must have "resided in" the municipality for one year preceding the election. The location of section 3-2's "business of the United States" exception--in the Election Code, and in an article of the Election Code dedicated exclusively to voter qualification--supports the conclusion that the exception applies only to the Election Code's "qualified voter" standard, and not to any supplemental candidate qualifications located outside the Election Code.

We find further support for our construction of the reach of section 3-2 in the rule that a court, when possible, should read a statute so as to give effect to all of its provisions and render

none meaningless or superfluous. *E.g.*, *Grafner v. Dept. Of Employment Security*, 393 Ill. App. 3d 791, 803, 914 N.E.2d 520 (2009). As we have noted above, among its provisions regarding candidate qualification, the Municipal Code contains an exception that, for purposes of the candidate residency requirement of subsection 3.1-10-5(a) of the Municipal Code, allows those in active military service to be deemed residents of a municipality during the pendency of their military service even when they reside outside the municipality during their service. 65 ILCS 3.1-10-5(d) (West 2008). If section 3-2 of the Election Code applied to candidates, then its statement that a person will not lose his or her residence "by reason of his or her absence on business of the United States" would certainly apply to relax the candidate residency qualifications on those who serve in the nation's armed forces. If we were to interpret section 3-2 as applying to candidates as well as voters, then, subsection 3.1-10-5(d) of the Municipal Code would become wholly redundant. Our duty to give meaning to statutory enactments where possible, like our duty to follow the plain language of the statutes we interpret, therefore compels the conclusion that section 3-2 of the Election Code was intended to create a residency exception for voters, not candidates.

We are not the first to draw the distinction between voters and candidates for purposes of the type of exception contained in section 3-2 of the Election Code. The exception traces to

23

Illinois' founding charter, which imposed a residency requirement on state representatives but excepted those who were "absent on the public business of the United States." Ill. Const. 1818, art. II, §3. Illinois' next constitution, in 1848, stated the exception three times: once for state representatives (Ill. Const. 1848, art. III, §3), once for state senators (Ill. Const. 1848, art. III, §4), and once for voters (Ill. Const. 1848, art. VI, §5). The 1848 Constitution thus separately delineated "business of the United States" exceptions for candidates and for voters. Illinois' next constitution, in 1870, retained the "business of the United States" exception as it related to voters (see Ill. Const. 1870, art. VII, §4), yet conspicuously omitted the exception as it related to candidates. (The voter exception was later incorporated into the Election Code (see 1959 Ill. Laws 2168) and was not included in our current constitution.) This history tells us that, for purposes of the "business of the United States" residency exception, this State has for over 150 years recognized a distinction between voters and candidates and has retained the exception only for voters. That revelation, combined with our interpretation of the language of section 3-2 and its interrelation with subsection 3.1-10-5(d) of the Municipal Code, convinces us that section 3-2's "business of the United States" exception applies only to voters, not to candidates. Accordingly, it cannot avail the candidate here.

For the foregoing reasons, we conclude that the candidate neither meets the Municipal Code's requirement that he have

24

"resided in" Chicago for the year preceding the election in which he seeks to participate nor falls within any exception to the requirement. Accordingly, we disagree with the Board's conclusion that he is eligible to run for the office of Mayor of the City of Chicago. We reverse the circuit court's judgment confirming the Board's decision, set aside the Board's decision, and, pursuant to Supreme Court Rule 366(a)(5) (Ill. Sup. Ct. R. 366(a)(5) (eff. Feb. 1, 1994)), order that the candidate's name be excluded (or, if necessary, removed) from the ballot for the February 22, 2011, Chicago mayoral election.

Reversed.

JUSTICE LAMPKIN, dissenting.

I dissent. I would affirm the judgment of the circuit court, which confirmed the decision of the Board. The candidate is entitled to have his name included on the ballot as a mayoral candidate because he has satisfied the requirements of section 3.1-10-5 of the Municipal Code where he is both a qualified elector of Chicago and has resided in Chicago at least one year next preceding the election.

I disagree with the majority's contrary conclusion that the candidate is not eligible to be on the ballot because that conclusion is based on an analysis of two issues–establishing residency and a statutory exemption to the residency requirement–that are not relevant to the resolution of this case.

25

The majority acknowledges that the candidate had established a residency in Chicago long before 2009 where he had both a physical presence here and the intent to remain.  The majority failed, however, to move past the issue of establishing residency to the relevant analysis, which turns on whether the candidate's residency, which he had indisputably held, was abandoned when he worked in Washington, D.C., and leased his Chicago home.

The Board's ruling–that the candidate in 2009 and 2010 did not abandon his status as a resident of Chicago and, thus, remained a resident of Chicago even though he was largely absent from this city from January 2009 until October 1, 2010–was not clearly erroneous.  Intent is an issue of fact (*Delk*, 112 Ill. App. 3d at 738), and the majority acknowledges that the Board's fact findings were not against the manifest weight of the evidence.  This acknowledgment should have ended this case, and resulted in this court affirming the circuit court's judgment, which confirmed the Board's ruling that the preponderance of the evidence established that the candidate never formed an intent to either change or terminate his residence in Chicago, or establish his residence in Washington, D.C., or any place other than Chicago.

Because the candidate had established his Chicago residency, it is presumed to continue until the contrary is shown, and the burden of proof is on the person who claims that there has been a

change. *Hatcher v. Anders*, 117 Ill. App. 3d 236, 239 (1983). In the foundational case *Kreitz v. Behrensmeyer*, 125 Ill. 141 (1888), the supreme court stated:

> "We have frequently held that when a party leaves his residence, or acquires a new one, it is the intention with which he does so that is to control. Hence the shortest absence, if, at the time, intended as a permanent abandonment, is sufficient, although the party may soon afterwards change his intention; while, on the other hand, an absence for months or even years, if all the while intended as a mere temporary absence for some temporary purpose, to be followed by a resumption of the former residence, will not be an abandonment." *Kreitz*, 125 Ill. at 195.

The majority does not acknowledge *Kreitz* even though it has been the leading case defining "residence" since its issuance 122 years ago. To the extent the majority addresses the long-held principle that a party's intention when he leaves or acquires his residence largely controls the determination of whether he has abandoned the residence, the majority distorts this principle (see discussion of *Smith* below). Then, the majority simply reads the principle out of its analysis, choosing instead to adopt a completely new standard.

27

In order to have changed one's residence, a person, both in fact and intention, must have abandoned the former residence and acquired a new one by actual residence with the intent to make it a permanent home. See *Frisbie*, 44 Ill. 16; *Welsh v. Shumway*, 232 Ill. 54, 77 (1907); *Baumgartner*, 355 Ill. App. 3d at 848. Affirmative acts must be proved to sustain the abandonment of a residence, and a temporary absence, no matter how protracted, does not equate with abandonment. *Hughes v. Illinois Public Aid Comm'n*, 2 Ill. 2d 374, 380-81 (1954); *Davis v. Davis*, 9 Ill. App. 3d 922, 926 (1973); *Hatcher*, 117 Ill. App. 3d at 239.

Because a person may have only one residence for voting purposes, when a person has established a physical presence in two locations, he must make a decision about which location he intends to make his permanent residence. *Baumgartner*, 355 Ill. App. 3d at 849. As long as he does not seek to "exercise the rights of property or of citizenship incident to or resulting from permanent residence" at his new location but, instead, continues to exercise those rights, including the right to vote, at his original location, he remains a resident at the original location. *Baumgartner*, 355 Ill. App. 3d at 849, quoting *Welsh*, 232 Ill. at 88-89; see also *Tuthill v. Rendleman*, 387 Ill. 321, 342-43 (1944).

Application of these well-established principles to the instant case compels the conclusion that the candidate did not

abandon his Chicago residence while he worked in Washington, D.C. According to the record, the candidate testified that he intended to work in Washington, D.C., for no more than two years. Consistent with that intent, he leased his Chicago home on a short-term basis. Although he and his wife were initially reluctant to lease their Chicago home, they heeded the advice of their friend and real estate consultant to lease the home during their absence for safety purposes. The candidate's intent to work in Washington, D.C., for the limited time frame and then return to his home in Chicago was confirmed by the testimony of three personal friends.

The candidate initially rented an apartment in Washington, D.C., but later rented a home when his family joined him during the summer of 2009. The lease terms of both his Chicago residence and the Washington, D.C., home coincided with the school year of the candidate's children in order to provide the least disruption possible to their education. Prior to the family's move to Washington, D.C., the candidate's wife and her friends filled 100 boxes with belongings that were then left in a locked storage area in the basement of the Chicago home. The candidate described the stored items as the family's most valuable possessions, including his wife's wedding gown, heirloom china, family photograph albums, an heirloom coat brought by the candidate's grandfather when he immigrated to the United States, the clothes and birth outfits of the candidate's children, and their school projects and report

29

cards.

Additionally, the candidate's family returned to Chicago two or three times for physician's appointments and celebratory gatherings. The candidate's wife maintained contact with the lessees of the Chicago home in order to facilitate repairs within the home and to schedule three or four occasions for the piano of the candidate's family to be tuned in their absence.

Furthermore, the candidate never voted in Washington, D.C., never changed his driver's license to Washington, D.C., never registered his car in Washington, D.C., never purchased property in Washington, D.C., never conducted personal banking in Washington, D.C., and never demonstrated an intent to sell his Chicago home.

The challengers failed to counter the candidate's evidence, and the Board found that the weight of this evidence established that the candidate intended to maintain his residence in Chicago throughout the time of his temporary employment in Washington, D.C.

Since the majority could not meddle with the Board's fact findings or its ruling based on the proper application of the manifest weight and clearly erroneous standards, the majority attacks the Board's ruling from another angle. Specifically, the majority promulgates a new and undefined standard for determining candidate residency requirements despite the plethora of clear, relevant and well-established precedent that has been used by our circuit courts and election boards for decades. In order to launch

30

its new standard, the majority first attempts to clear the relevant precedent from the field.

The majority attempts to discard the rulings in *Baumgartner*, *Walsh*, and *Delk*, three of the most recent appellate court decisions interpreting the term "has resided in" in the context of candidacy. According to the majority, those decisions are of little value because they "equate[d]" the voter and candidate residency requirements without an adequate discussion.

I disagree with the majority's characterization of the analysis in *Baumgartner*, *Walsh*, and *Delk*. Surely the author of this opinion, Justice Hoffman, must have agreed with the analysis and holding in *Walsh* because he was one of the concurring justices on that opinion. In *Walsh*, he agreed that physical presence and intent to remain at a place as a permanent home created a residence for purposes of candidacy. *Walsh*, 267 Ill. App. 3d at 976. In *Walsh*, Justice Hoffman agreed that intent was a factual consideration and that *Delk*, which he now dismisses, supported his position. *Id.*

Neither *Baumgartner*, nor *Walsh*, nor *Delk* has been overruled or even called into question. Indeed, the supreme court denied petitions for leave to appeal in both *Baumgartner* and *Walsh*, and no petition was ever filed in *Delk*. Accordingly, these three cases remain undisturbed. *Baumgartner* is a Fourth District case, and

31

*Walsh* and *Delk* are First District cases. Although the principle of *stare decisis* does not require an appellate court to follow the decisions of its sister divisions or other districts, the cases at issue remain persuasive.

The majority completely ignores *Dillavou*, a recent Fourth District case that addressed candidate residency, even though *Walsh*, on which Justice Hoffman previously concurred, favorably cited *Dillavou* and discussed it at length. *Walsh*, 267 Ill. App. 3d at 978-79. I recognize that the question in *Dillavou* was whether the candidate at issue had established a residence in the required district; however, the case cites approvingly to supreme court election cases such as *Clark* and *Kreitz*. *Dillavou*, 260 Ill. App. 3d at 132. Of particular relevance to the case before this court, *Dillavou* quotes the language of *Clark* and *Kreitz*, which provides that, once established, a residence will not be lost by an individual's absence from that residence unless the individual demonstrates such an intent. *Dillavou*, 260 Ill. App. 3d at 132-33.

The majority's attempt to maneuver around the supreme court decision in *Smith* is futile. *Smith* cannot be distinguished from the relevant issue the majority should have addressed here, *i.e.*, whether the candidate abandoned his Chicago residence. *Smith* reviewed whether the appellant was eligible for his appointment to the judiciary in accordance with the constitutional requirement to

have been a resident of Illinois for five years next preceding his appointment. *Smith*, 44 Ill. at 23-24. *Smith* focused on the relevant issue, *i.e.*, whether the appellant lost his Illinois residency where he had resided in Illinois for many years before he left to live and work in Tennessee for several months and then returned to Illinois. *Smith*, 44 Ill. at 24. *Smith* determined the prosecutor failed to prove by clear and satisfactory evidence that the appellant lost his Illinois residency. *Smith*, 44 Ill. at 24-25.

The majority is wrong when it contends the *Smith* decision was "based solely on the officeholder's intent to return." To the contrary, the court, in reaching its determination, considered "all of the circumstances in evidence," and not solely the prosecution's failure to establish that the appellant never intended to abandon his Illinois residence. *Smith*, 44 Ill. at 24-25. Specifically, the court considered the appellant's frequent declarations that his move to Tennessee was only an experiment and he would return to Illinois if he found that he could not remain with satisfaction among the Tennesseans. *Smith*, 44 Ill. at 24. Further, the appellant refused his partner's request to vote in Tennessee for a particular candidate, saying he did not want to lose his Illinois citizenship. *Smith*, 44 Ill. at 24. The appellant also refused to sell his Illinois law books, saying that he would probably return

to Illinois and would need them in his practice. *Smith*, 44 Ill. at 24. Moreover, the appellant only rented his residence when he left Illinois. *Smith*, 44 Ill. at 24.

The majority speculates that the supreme court in *Smith* nominally discussed principles of residence while it actually applied concepts of domicile. Such speculation is baseless and refuted by the text. Although the terms and concepts of residence and domicile were referenced in the prosecution's presentation of the facts and law (*Smith*, 44 Ill. at 22-23), in its opinion, the *Smith* court spoke of *residence* and never used the term *domicile* (*Smith*, 44 Ill. at 24-25). Furthermore, there is no support for the majority's assertion that the *Smith* analysis was based *solely* on intent, which supposedly is "the defining characteristic of the principle of domicile." *Smith* clearly stated "that, when the residence is lost, it is by *a union of intention and acts ***.*" (Emphasis added). *Smith*, 44 Ill. at 25. Clearly, *Smith*, consistent with *Park*, analyzed the question of residence *not* solely based on intent but, rather, "largely" based on intent. *Park*, 374 Ill. at 43.

The majority imagines that the supreme court did not know the difference between *residence* and *domicile* until it issued *Pope*, and that *Pope* signifies that the court "has since abandoned" that solely intent-based approach for which *Smith* supposedly stands.

34

No. 1-11-0033

This is pure flight of fancy. *Pope* neither cites nor criticizes *Smith*. Instead, *Pope* confirms the well-established legal premise that once a residence has been established, "a person, by temporary removal of himself and his family into another State with the intention to return, will not thereby lose his residence in this State provided he does no act from which the acquisition of a new residence may be inferred." *Pope*, 370 Ill. at 200. The majority has failed to abide by the principle, stated in *Pope*, that once a residence is established, as was uncontested here, the court must look to the facts to determine whether the individual abandoned that residence or intended to return to it. *Pope*, 370 Ill. at 203.

The majority's analysis goes further astray when it construes the statutory requirements to be a candidate for municipal office. The Municipal Code expressly provides that "[t]he general election law applies to the scheduling, manner of conducting, voting at, and contesting of municipal elections." 65 ILCS 5/3.1-10-10 (West 2008). In addition, the supreme court has held that provisions of the Election Code and Municipal Code may be considered *in pari materia* for purposes of statutory construction. *Cinkus*, 228 Ill. 2d at 218-19.

Accordingly, a court that is construing provisions of the Municipal Code concerning candidate residency requirements should also consider the similar provisions of the Election Code

35

concerning voter residency requirements. Well-established precedent shows that courts have construed the "has resided in" phrase used in section 3.1-10-5(a) of the Municipal Code consistently with the "has resided in" phrase used in section 3-1 of the Election Code. See *Smith*, 44 Ill. 16; *Delk*, 112 Ill. App. 3d at 738; *Walsh*, 267 Ill. App. 3d at 976; *Baumgartner*, 355 Ill. App. 3d at 847-48. Nevertheless, the majority, completely unsupported by citation to any case law, arrives at different meanings for the terms "residence" and "has resided in" as used in section 3.1-10-5(a) of the Municipal Code and sections 3-1 and 3-2(a) of the Election Code.

The Municipal Code and the Election Code both require a candidate or a voter to have "resided in" the relevant locale for eligibility. Compare 65 ILCS 5/3.1-10-5(a) (West 2008) to 10 ILCS 5/3-1 (West 2008). More importantly, as the majority agrees, the Municipal Code expressly relies on the Election Code to define "qualified elector." Specifically, section 3.1-10-5(a) of the Municipal Code states that a candidate for municipal office must be a qualified elector and have resided in the municipality at least one year next preceding the election. 65 ILCS 5/3.1-10-5(a) (West 2008). Consequently, the reader must look at section 3-1 of the Election Code to determine what constitutes a qualified elector.

Section 3-1 then informs the reader that a qualified elector

is a person who "has resided in" Illinois and the election district 30 days next preceding the election. 10 ILCS 5/3-1 (West 2008). Furthermore, section 3-2(a) of the Election Code informs the reader that a "permanent abode is necessary to constitute a residence within the meaning of Section 3-1." 10 ILCS 5/3-2(a) (West 2008).

This cross-reference in section 3-2(a), which discusses "residence," to section 3-1, which discusses how long a person "had resided in" an election district, in order to define the term residence seriously undermines the majority's position that the meaning attributed to the term "residence" does not inform a court's construction of the phrase "has resided in."

Section 3-2(a) clearly indicates that "residence" defines the term "has resided in" in section 3-1. While section 3-2(a) is perhaps limited to the definition of a "qualified elector" as used in section 3.1-10-5(a) of the Municipal Code, "residence" is used to define "has resided in." As stated by the majority, the basic rules of statutory interpretation require that the same words used within a statute should be given the same meaning unless the context dictates otherwise. *McMahan*, 183 Ill. 2d at 513.

Nothing in the text or context of these statutes distinguishes "has resided in" as used to define a "qualified elector" from "has resided in" as used to define the length of time a candidate must have been resident in order to run for office. Moreover, if the

37

legislature had intended the phrase "has resided in" to mean *actually lived in*, as the majority proposes, then the legislature surely would have chosen to use the more innocuous word *live* rather than the verb reside and the noun residence, which are charged with legal implications.

*Moran* does not support the majority's proposition that the supreme court has indicated voter and candidate residency requirements might diverge. In *Moran*, the supreme court rejected the arguments of the plaintiff, who challenged the validity of the village's incorporation and the election of its new officers. *Moran*, 20 Ill. 2d 95. The plaintiff complained that several people who had voted for the new officers were not qualified electors because, according to the plaintiff, Illinois public policy and legislative intent must have required the electors to have resided in the area for more than 30 days where the statute required a municipal officer to have resided in the area at least one year next preceding his election. *Moran*, 20 Ill. 2d at 104.

The supreme court rejected the plaintiff's argument, noting a statutory differentiation between an elector and a candidate for municipal office. *Moran*, 20 Ill. 2d at 104. That distinction, however, was not based upon the nature of their residency but, rather, on the length of time necessary to establish their residency. Specifically, the relevant statute defined "an

38

'elector' as one who has resided in the State for one year, in the county for 90 days and in the area or precinct for 30 days" whereas the candidate was required to have "resided in the area at least one year next preceding his election or appointment." *Id.* The majority's attempt to read this temporal distinction between candidates and electors as some sort of indication from the supreme court that the majority may embark on a revision of Illinois law concerning candidate residency requirements is indefensible.

The majority attempts to support its creation of a completely new candidate residency standard with an exhaustive (or, rather, exhausting) discussion of section 3.1-10-5(d) of the Municipal Code regarding the military exception. The candidate here was not in the military and did not attempt to claim an exemption under section 3.1-10-5(d). Nevertheless, while the majority spends five pages of its opinion on a subsection of the Municipal Code that has no applicability to the present case, the majority does not write a single sentence explaining how it defines "actually resided in." It is patently clear that the majority fails to even attempt to define its newly discovered standard because it is a figment of the majority's imagination.

How many days may a person stay away from his home before the majority would decide he no longer "actually resides" in it? Would the majority have us pick a number out of a hat? A standard which

cannot be defined cannot be applied. If the majority had picked even an arbitrary number of days that voters need not sleep in their own beds before they violated this new arbitrary standard, then at least we would be able to apply this new standard. Should a court consider just the number of days a voter or candidate is absent or are there other relevant factors under the new standard? Apparently, only the majority knows but, for some reason, fails to share it with those charged to abide by it if they want to be a candidate for municipal office.

The majority's promulgation of a new undefined standard cuts off the various boards of elections and circuit courts of this State from over 100 years of precedent. Clearly, the majority must posit the existence of a new standard in order to avoid the application of the manifest weight standard to the Board's fact findings and application of the clearly erroneous standard to the Board's ruling that the candidate did not intend to abandon his residence. The majority says, as it must, that it accepts the Board's findings of fact. Therefore the majority must fault the Board for failing to apply as the correct legal principle of candidate residency a standard that the majority just conjured out of thin air.

If the majority truly believes that "actually resides" is the correct standard to apply, the majority should remand this case back to the Board for a further hearing. Merely saying the

40

candidate "unquestionably does not satisfy" its newly-minted standard, when the ink of its creation has barely dried on the paper, cannot be a proper substitution for providing a hearing. The majority's application of a new standard in the instant case shows a careless disregard for the law shortly before an election for the office of mayor in a major city. One can hardly imagine how future potential candidates for municipal office in Illinois will navigate the maze invented by the majority's amorphous standard. The majority's new standard is ill-reasoned and unfair to the candidate, voters, and those of us who are charged with applying the law.

While I strongly believe that the majority's holding is completely erroneous, if the majority were to apply it only prospectively, rather than retroactively to this candidate, there would be sufficient time for our supreme court to thoughtfully review it. The majority's decision disenfranchises not just this particular candidate, but every voter in Chicago who would consider voting for him. Well-settled law does not countenance such a result.

Finally, the majority's decision certainly "involves a question of such importance that it should be decided by the Supreme Court." Supreme Court Rule 316 (Official Reports Advance Sheet No. 26 (Dec. 20, 2006), R. 316, eff. Dec. 6, 2006. Consequently, I believe this panel should certify this case under

No. 1-11-0033

Supreme Court Rule 316, which would permit review of the majority's decision in the most expeditious manner possible. The majority, however, has refused to certify this case under Rule 316. As of the writing of this dissent, there is less than one month before the election and even less time for absentee ballots to be mailed out and returned. An opinion of such wide-ranging import and not based on established law but, rather, on the whims of two judges, should not be allowed to stand.

For the reasons stated, I would affirm the judgment of the circuit court, which confirmed the decision of the Board.