Docket No. 111773.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

WALTER P. MAKSYM *et al.*, Appellees, v. THE BOARD OF
ELECTION COMMISSIONERS OF THE CITY OF CHICAGO *et
al.*, Appellants.

*Opinion filed January 27, 2011.*

JUSTICE THOMAS delivered the judgment of the court, with
opinion.
Chief Justice Kilbride and Justices Garman, Karmeier, and Theis
concurred in the judgment and opinion.
Justices Freeman and Burke specially concurred, with opinion.

**OPINION**

The petitioners, Walter P. Maksym, Jr., and Thomas L.
McMahon, filed written objections to the candidacy of the respondent,
Rahm Emanuel (the candidate), who seeks to be a candidate for
mayor of the City of Chicago in the municipal general election to be
held on February 22, 2011. After an evidentiary hearing, the Board of
Election Commissioners of the City of Chicago (the Board) dismissed
the objections and ruled that the candidate was entitled to have his
name included on the ballot as a mayoral candidate. The petitioners
sought judicial review in the circuit court of Cook County, which
confirmed the decision of the Board. The petitioners appealed, and the
appellate court reversed the circuit court's judgment, set aside the

Board's decision, and ordered that the candidate's name be excluded (or, if necessary, removed) from the ballot for Chicago's February 22, 2011, mayoral election. No. 1–11–0033. We allowed the candidate's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

Although the parties engaged in an extensive evidentiary hearing prior to the Board's decision, the pertinent facts are largely undisputed on appeal. The appellate court summarized and adopted the Board's factual findings. In doing so, the court concluded that the factual findings were not against the manifest weight of the evidence. We agree with the appellate court that the Board's factual findings were not against the manifest weight of the evidence. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). Accordingly, we set forth the facts largely as summarized in the appellate court opinion.

The candidate was born in Chicago and, in December 1998, purchased a Chicago home (the Hermitage House), which he still owns. The candidate lived with his family in that home from 1998 through January 2009. On January 2, 2009, the candidate, who had up to then served as a member of the United States House of Representatives elected from the district that included the Hermitage House, resigned his office in order to serve in Washington, D.C., as Chief of Staff to the President of the United States. After traveling to Washington, D.C., he and his spouse purchased additional land adjoining their Chicago property.

From January through May 2009, the candidate lived in an "in-law apartment" in Washington, D.C., while his family remained in the Hermitage House. From June 2009 until October 1, 2010, the candidate, and his family, lived in a Washington, D.C., house (the Woodley House) that was leased for the term spanning June 1, 2009, through June 30, 2011. The family received their mail at the Woodley House and moved most of their clothes and personal belongings to Washington, D.C. They did, however, leave behind at the Hermitage House several larger household items, including televisions, a piano, and a bed, as well as several personal possessions such as family heirlooms and books. The candidate's Hermitage House was leased to another family for the term of September 1, 2009, through June 30, 2011.

At all relevant times, including the time he was in Washington,

D.C., the candidate continued to pay property taxes for the Hermitage House, continued to hold an Illinois driver's license listing the Hermitage House as his address, continued to list the Hermitage House address on his personal checks, and continued to vote with the Hermitage House as his registered voting address. He did, however, pay income tax in 2009 and 2010 to both Washington, D.C., and Illinois.

On October 1, 2010, the candidate resigned his position of Chief of Staff to the President of the United States and entered into a lease to live in an apartment located on Milwaukee Avenue in Chicago from October 1, 2010, through June 30, 2011. He has lived in that apartment since October 1, 2010. In his testimony, the candidate explained that he had always expected to serve as Chief of Staff to the President for approximately 18 to 24 months before returning to live in the Hermitage House.

From these facts, the Board concluded that the candidate met the qualification for candidacy, contained in subsection 3.1–10–5(a) of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/3.1–10–5(a) (West 2008)), mandating that he had "resided in" Chicago for the one year preceding the February 22, 2011, mayoral election. The Board noted that the objectors and candidate agreed that "residence" in this context means "permanent abode," and that two elements are required for a permanent abode: (1) physical presence; and (2) an intent to remain there as a permanent abode. The Board cited case law establishing that, once a permanent abode is established, residence continues until abandoned. The Board concluded that the objectors had failed to establish that the candidate abandoned his residence, basing its conclusion on the evidence that the candidate maintained significant contacts with Chicago, intended to return to Chicago and to the Hermitage House, and had lived in Washington, D.C., solely for the purpose of working for the President. Among the findings made by the Board were the following:

> –"The preponderance of this evidence establishes that the Candidate never formed an intention to terminate his residence in Chicago; never formed an intention to establish his residence in Washington, D.C., or any place other than Chicago; and never formed an intention to change his residence."

-3-

–"The preponderance of this evidence further establishes that throughout the relevant period in 2009 and 2010 the Candidate maintained significant contacts in and with the City of Chicago and the State of Illinois, including continuing ownership of real estate; continuing ownership of valuable personal property of kinds that a reasonable person would store at the place he deemed to be his permanent residence and to which he planned to return."

–"The preponderance of this evidence, particularly including the coincidental terms of the leases and extensions of leases of the Hermitage House and the Woodley House compel the inference that the Candidate and his spouse intended to return to occupy the Hermitage House and abide there."

–"The preponderance of this evidence establishes that the Candidate intended his presence in Washington, D.C., solely for the purpose of permitting him to discharge what he perceived to be a duty to serve the United States in the capacity of the Chief of Staff to the President of the United States."

–"The weight of the evidence shows that the Objectors failed to bear their burdens of proof and persuasion that the Candidate intended, in 2009 or 2010, to effect any change in his residence or to be anything other than a resident of Chicago for electoral purposes."

The petitioners filed a petition for judicial review in the circuit court, and the court confirmed the Board's decision. The circuit court agreed with the Board that the relevant question was whether the candidate abandoned his Chicago residence when he became Chief of Staff to the President of the United States. The court determined that the Board's finding that the objectors had failed to show that the candidate abandoned his Chicago residence was not clearly erroneous.

The objectors appealed, and the appellate court reversed the decision of the circuit court and set aside the decision of the Board. The court noted that the Board's factual findings are deemed *prima facie* true and correct and may be overturned only if they are against the manifest weight of the evidence. Moreover, an electoral board's

rulings on mixed questions of law and fact–questions on which the undisputed law is applied to the historical facts–are reviewed under the clearly erroneous standard. No. 1–11–0033, slip op. at 5 (citing *Cinkus*, 228 Ill. 2d at 210-11). The court determined, however, that it first needed to resolve a question of statutory construction to which the *de novo* standard of review would apply: what is the meaning of the phrase "resided in" in the section of the Municipal Code requiring that a candidate must have "resided in the municipality at least one year next preceding the election" (65 ILCS 5/3.1–10–5(a) (West 2008)). No. 1–11–0033, slip op. at 4-5.

The court noted that the Board had used the definition of residence that is used in voter qualification cases (permanent abode). Moreover, the court acknowledged that using the same definition for voter qualification and candidate qualification was an approach that was supported by all of the published appellate court case law on the issue. However, the court was unconvinced that this was the correct test because it could not find a published supreme court opinion ratifying, adopting, or directly addressing this approach. No. 1–11–0033, slip op. at 6. The court acknowledged that in *Smith v. People ex rel. Frisbie*, 44 Ill. 16 (1867), this court used an intent-based approach in determining a candidate residency question, but found this unpersuasive because a different standard of proof was applicable in that case.[1] The court also noted that *Smith* was a *quo warranto* action in which the candidate already held office and that there was a presumption that he was entitled to hold the office to which he had been appointed. The court stated that it was unaware of any "similar presumption applicable to this case."[2] No. 1–11–0033,

---

[1]The appellate court left it to the reader to discern how the standard of proof was in any way relevant to what standard the court used to determine the merits of the residency issue.

[2]Because the election has yet to occur, there is, of course, no presumption that the candidate is entitled to the office he seeks. Nevertheless, there *is* a similar presumption applicable to the specific question before us, in that the candidate is presumed to be a Chicago resident. See *In re Moir's Estate*, 207 Ill. 180, 186 (1904), in which this court explained that "when a residence is once established the presumption is that it continues."

slip op. at 7.

The court also found unpersuasive the candidate's argument that the Election Code defines residence as "permanent abode" (10 ILCS 5/3–2 (West 2008)) and that this court has expressly directed that the Municipal Code and the Election Code be construed *in pari materia*. See *Cinkus*, 228 Ill. 2d at 218-19. The court determined that the *in pari materia* doctrine meant only that the statutes should be given a harmonious construction, not necessarily an identical one. No. 1–11–0033, slip op. at 8. The court found more relevant than *Cinkus*–a two-year-old case mandating *in pari materia* construction–a quote from a 1960 case, *People ex rel. Moran v. Teolis*, 20 Ill. 2d 95, 104 (1960), in which this court stated that the statute at issue "differentiate[d] between 'electors' and those persons who may qualify for municipal office."[3] No. 1–11–0033, slip op. at 9.

In other words, the court determined that it was painting on a blank canvas, with no applicable authority to guide it other than the *Moran* quote. The court ultimately determined that, as used in section 3.1–10–5(a), "resided in" does *not* refer to a permanent abode, but rather where a person "actually live[s]" or "actually reside[s]." No. 1–11–0033, slip op. at 20-21. However, the court never explained what it meant by these terms, other than to say that the candidate does not qualify as a resident if this definition is used.

The court arrived at this definition by employing the following reasoning. First, the court relied on *People v. Ballhorn*, 100 Ill. App. 571 (1901), a decision that it acknowledged had no precedential authority under *Bryson v. New America Publications*, 174 Il. 2d 77, 1935 (1996) (appellate court decisions filed prior to 1935 have no binding authority), for the proposition that the purpose of candidate residency requirements is that candidates be component parts of the units they represent, and that this can be accomplished only by actual, rather than constructive, residency. No. 1–11–0033, slip op. at 12-13. Next, the court noted that section 3.1–10–5 of the Municipal Code sets forth two qualifications for candidates and that they are stated in

---

[3]This court did so, however, only in the context of setting forth the different *time limits* for the respective residency requirements. See *Moran*, 20 Ill. 2d at 104.

the conjunctive: a candidate must be "a qualified elector of the municipality and [must have] resided in the municipality at least one year next preceding the election."[4] The court determined that the candidate was clearly a qualified elector because, without regard to whether the Hermitage House constituted the candidate's permanent place of abode while it was under lease, the candidate qualified for the exception set forth in section 3–2(a) of the Election Code, which states that "No elector or spouse shall be deemed to have lost his or her residence in any precinct or election district in this State by reason of his or her absence on business of the United States, or of this State." The court held that the candidate was on the business of the United States when he was employed as Chief of Staff to the President of the United States. No. 1–11–0033, slip op. at 14-15.

The court next took up the meaning of "resided in." The court acknowledged that section 3.1–10–5(a) contains a residency requirement, but held that its use of the term "resided in" means something other than residency as that term is traditionally understood. The court supported this interpretation by contending that the verb "resides" and the noun "resident" are used to entirely different effect in section 3.1–10–5(d), which applies to people (or their spouses) on active military duty. The court believed that the terms "resident" and "resides" connote different meanings in this subsection, and thus must have different meanings elsewhere in section 3.1–10–5. According to the court, "resides" in subsection (d)

---

[4]In pertinent part, the relevant statutes for determining whether one is a qualified elector provide that:

> "§3–1. Every person *** who has resided in this State and in the election district 30 days next preceding any election therein *** and who is a citizen of the United States, of the age of 18 or more years is entitled to vote at such election for all offices and on all propositions." 10 ILCS 5/3–1 (West 2008).

> "§3–2. (a) A permanent abode is necessary to constitute a residence within the meaning of Section 3–1. No electors or spouse shall be deemed to have lost his or her residence in any precinct or election district in this State by reason of his or her absence on business of the United States, or of this State." 10 ILCS 5/3–2 (West 2008).

means "actually live," so "resided in" in subsection (a) must also mean "actually live." No. 1–11–0033, slip op. at 16-20. Finally, the court determined that the "business of the United States" exception stated in section 3–2 of the Election Code applied only to the qualification of electors and did not apply to the candidate qualifications set forth in section 3.1–10–5 of the Municipal Code. No. 1–11–0033, slip op. at 20-24.

Accordingly, although the appellate court found that the candidate unquestionably was a qualified elector, it concluded that he did not meet the residency requirement of section 3.1–10–5 because he did not "actually reside" or "actually live" in Chicago for the entire year next preceding the election. The court did so without ever explaining what it meant by the terms "actually reside" or "actually live." The court ordered the candidate's name excluded or removed from the ballot.

Justice Lampkin dissented. Justice Lampkin disagreed with nearly every aspect of the majority's decision and would have applied the traditional definition of residence that has been established in Illinois law. No. 1–11–0033, slip op. at 26-28 (Lampkin, J., dissenting). Applying this standard, the dissent would not have found the Board's decision clearly erroneous. No. 1–11–0033, slip op. at 28-30 (Lampkin, J., dissenting).

We allowed the candidate's petition for leave to appeal and stayed the appellate court's decision pending this appeal.

ANALYSIS

Before proceeding to the merits, we wish to emphasize that, until just a few days ago, the governing law on this question had been settled in this State for going on 150 years. In *Smith v. People ex rel. Frisbie*, 44 Ill. 16 (1867), this court was faced with a question remarkably similar to that which is before us today. Smith, a longtime resident of Illinois, had been appointed a circuit judge by the governor of Illinois, and a *quo warranto* action was brought to remove Smith from that office on the grounds that he had not been an Illinois resident "for at least five years next preceding *** his appointment," as the Illinois Constitution then required. In support of their action, the objectors pointed to the fact that Smith had moved with his family

to Tennessee for eight months during the relevant five-year residency period.

In concluding that Smith's eight-month sojourn to Tennessee did not result in an abandonment of his established Illinois residency, this court explained that, once established, "residence is lost *** by a union of intention and acts" and that "the intention in many cases will be inferred from the surrounding circumstances." *Smith*, 44 Ill. at 24. This court then examined the "surrounding circumstances" and found that (1) Smith frequently declared that his move to Tennessee was only an experiment; (2) just two months after arriving in Tennessee, Smith expressed a desire to return to Illinois as soon as became feasible; (3) Smith at no time expressed an unqualified intention to remain in Tennessee; (4) Smith declined to vote in a Tennessee election because "he desired to do no act by which he would lose his citizenship in [Illinois]"; (5) he refused to sell his Illinois law books prior to his move, saying that "he would probably return, and would then need them in his [Illinois] law practice"; and (6) he "only rented his [Illinois] residence when he left." *Smith*, 44 Ill. at 23-24. This evidence, the court concluded, was insufficient to "establish a presumption of loss of residence." *Smith*, 44 Ill. at 24-25.

Since *Smith* was decided, the principles established in it have been consistently and faithfully applied in the candidacy context by the appellate court of this State. See, *e.g.*, *People ex rel. Madigan v. Baumgartner*, 355 Ill. App. 3d 842, 847 (2005) (" '[W]here a person leaves his residence and goes to another place, even if it be another [s]tate, with an intention to return to his former abode, or with only a conditional intention of acquiring a new residence, he does not lose his former residence so long as his intention remains conditional.' " (quoting *Pope v. Board of Election Commissioners*, 370 Ill. 196, 201 (1938)); *Walsh v. County Officer Electoral Board*, 267 Ill. App. 3d 972, 976 (1994) (whether candidate abandoned old residence in favor of new residence presents a question of intent, which is measured both by the "surrounding circumstances" and the candidate's declarations thereof); *Dillavou v. County Officers Electoral Board*, 260 Ill. App. 3d 127, 132 (1994) (whether candidate abandoned established residence is a question of intent, and " 'an absence for months or even years, if all the while intended as a mere temporary absence for some temporary purpose, to be followed by a resumption of the former

residence, will not be an abandonment' ") (quoting *Kreitz v. Behrensmeyer*, 125 Ill. 141, 195 (1888)). Moreover, the principles established in *Smith* and uniformly followed since were the very principles relied upon by the hearing officer, the Board, and the circuit court below.

Thus, from April 1867 through January 24 of this year, the principles governing the question before us were settled. Things changed, however, when the appellate court below issued its decision and announced that it was no longer bound by any of the law cited above, including this court's decision in *Smith*, but was instead free to craft its own original standard for determining a candidate's residency. See No. 1–11–0033, slip op. at 6-8 (dismissing the foregoing authority in its entirety). Thus, our review of the appellate court's decision in this case begins not where it should, with an assessment of whether the court accurately applied established Illinois law to the particular facts, but with an assessment of whether the appellate court was justified in tossing out 150 years of settled residency law in favor of its own preferred standard. We emphatically hold that it was not.

The *Smith* principles control this case, plain and simple. With the sole exception of the prescribed time period, the provision at issue in *Smith* is identical to one the issue at here. Both provide that, in order to be eligible for public office, a person must reside in the relevant jurisdiction for some period "next preceding the election or appointment." And in both cases, the sole issue presented is whether the person seeking to hold the office in question had abandoned his Illinois residency by virtue of an extended relocation to another part of the country. In answering that question in *Smith*, this court explained that, once established, "residence is lost *** by a union of intention and acts" and that "the intention in many cases will be inferred from the surrounding circumstances." *Smith*, 44 Ill. at 24. The court then examined the surrounding circumstances, including both Smith's words and Smith's actions, to determine whether Smith had abandoned his Illinois residency. Ultimately, the court concluded that he had not. In every relevant way, the analysis that this court employed in *Smith* is the very analysis that the hearing officer, the Board, and the circuit court below employed, and they were correct in doing so. *Smith* has never been overruled, and it is directly on point.

For two reasons, the appellate court concluded that *Smith* was not

controlling authority in this case. Neither of these reasons is convincing. First, the court noted that, because *Smith* involved a *quo warranto* action, the burden of proof on the objecting party was higher (clear and convincing) than it is for the objectors in this case (preponderance of the evidence). No. 1–11–0033, slip op. at 7. While this is undeniably true, we fail to see how it renders *Smith*'s residency analysis irrelevant, as burden of proof does not impact *what* a party must prove, but only *how well* the party must prove it. The appellate court's other basis for rejecting *Smith* was its determination that, "although the supreme court's discussion in *Smith* was based nominally on principles of residence, it appears from its analysis that it actually applied concepts of domicile." No. 1–11–0033, slip op. at 7. In other words, the appellate court concluded that *Smith* is not binding because this court did not know what it was talking about when it wrote it. Leaving to one side the propriety of such a determination, two things quickly belie the appellate court's conclusion on this point: (1) the issue in *Smith* arose under the Illinois Constitution's residency provision, and consequently anything this court said on this point was, by definition, in relation to residency; and (2) as will be demonstrated below, this court has applied similar principles in virtually every setting in which it has construed a legal residency requirement.

All of that said, and putting aside the appellate court's conclusion that *Smith* is not binding in this case, the appellate court's residency analysis remains fundamentally flawed. This is because, even under traditional principles of statutory analysis, the inevitable conclusion is that the residency analysis conducted by the hearing officer, the Board, and the circuit court was proper.

The issue in this case is whether the candidate met the statutory requirements to run for and hold elected municipal office, as set forth in section 3.1–10–5(a) of the Municipal Code (65 ILCS 5/3.1–10–5(a) (2008)). That section states, in relevant part:

> "A person is not eligible for an elective municipal office unless that person is a qualified elector of the municipality and has resided in the municipality at least one year next preceding the election or appointment ***." 65 ILCS 5/3.1–10–5(a) (2008).

For present purposes, the critical question is what does this section

mean by "reside[ ] in"? This presents a question of statutory interpretation, which is a question of law subject to *de novo* review (*In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000)) and the rules governing our inquiry are familiar. Our primary goal when interpreting the language of a statute is to ascertain and give effect to the intent of the legislature. *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill.2d 414, 424-25 (2002). The plain language of a statute is the best indication of the legislature's intent. *In re Christopher K.*, 217 Ill.2d 348, 364 (2005). Where the statutory language is clear and unambiguous, we will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express. *In re Christopher K.*, 217 Ill.2d at 364.[5]

As *Smith* demonstrates, this court very early on announced the principles that would inform residency analysis in the context of eligibility to hold public office. And since *Smith*, this court has consistently applied similar residency principles in a variety of other contexts, most especially in the context of voting. From these cases, several well-settled principles emerge. First, to *establish* residency, two elements are required: (1) physical presence, and (2) an intent to remain in that place as a permanent home. *Hughes v. Illinois Public Aid Comm'n*, 2 Ill. 2d 374, 380 (1954) (citing voting cases). Second, once residency is established, the test is no longer physical presence but rather abandonment. Indeed, once a person has *established* residence, he or she can be physically absent from that residence for months or even years without having abandoned it:

> "The shortest absence, if, at the time, intended as a permanent abandonment, is sufficient, although the party may soon afterwards change his intention; while, on the other hand, an absence for months or even years, if all the while intended as a mere temporary absence for some temporary purpose, to

---

[5]For purposes of clarity, and like the legislature, we will use terms such as "residency," "resident," and "reside" interchangeably. See *Moran v. Katsinas*, 16 Ill. 2d 169, 174 (1959) ("where the same, *or substantially the same*, words or phrases appear in different parts of the same statute they will be given a generally accepted and consistent meaning" (emphasis added)); see also 10 ILCS 5/3–1, 3–2 (West 2008) (treating "resides in" and "residence" synonymously).

be followed by a resumption of the former residence, will not be an abandonment." *Kreitz v. Behrensmeyer,* 125 Ill. 141, 195 (1888).

Stated differently, a residence is not lost "by temporary removal with the intention to return, or even with a conditional intention of acquiring a new residence, but when one abandons his home and takes up his residence in another county or election district." *Clark v. Quick*, 377 Ill. 424, 427 (1941). Third, both the establishment and the abandonment of a residence is principally a question of intent. *Park v. Hood*, 374 Ill. 36, 43 (1940). And while "[i]ntent is gathered primarily from the acts of a person" (*Stein v. County Board of School Trustees*, 40 Ill. 2d 477, 480 (1968)), a voter is competent to testify as to his intention, though such testimony is not necessarily conclusive (*Coffey v. Board of Election Commissioners*, 375 Ill. 385, 387 (1940)). Fourth, and finally, once a residence has been established, the presumption is that it continues, and the burden of proof is on the contesting party to show that it has been abandoned. *In re Estate of Moir*, 207 Ill. 180, 186 (1904).

The question, then, is whether there is any indication that, in enacting and amending section 3.1–10–5(a) of the Municipal Code, the legislature intended residence to mean anything other than what it has meant in this state for well over a century. There is no such indication.

This court has held that "[w]ords used in the Municipal Code, as in any other statute, are to be given their plain and commonly understood meaning in the absence of an indication of legislative intent to the contrary." *In re Petition to Annex Certain Territory to Village of North Barrington*, 144 Ill. 2d 353, 362 (1991). And where a term has a settled legal meaning, this court will normally infer that the legislature intended to incorporate that settled meaning. *People v. Smith*, 236 Ill. 2d 162, 167 (2010). In Illinois, the legal meaning of residence has been settled for well over 100 years, not only in the very context that section 3.1–10–5(a) concerns (see *Smith*, 44 Ill. at 23-25), but in virtually every other setting in which this court has construed a legal residency requirement. See, *e.g.*, *Hughes v. Illinois Public Aid Comm'n*, 2 Ill. 2d 374, 380 (1954) (eligibility for state public aid); *People ex rel. Heydenrich v. Lyons*, 374 Ill. 557, 566 (1940) (eligibility for local public aid); *In re Petition of Mulford*, 217

Ill. 242, 249 (1905) (eligibility to serve as executor of decedent's estate); *In re Estate of Moir*, 207 Ill. 180, 186-87 (1904) (liability for inheritance tax); *Smith v. People ex rel. Frisbee*, 44 Ill. 2d 16 (1867) (eligibility to hold public office). There is absolutely no indication anywhere in the Municipal Code that the legislature intended residency in section 3.1–10–5(a) to mean anything other than this well-settled meaning.

Second, this court has twice stated explicitly that related provisions of the Election Code and of the Illinois Municipal Code are to be considered *in pari materia* for purposes of statutory construction. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 218 (2008); *United Citizens of Chicago and Illinois v. Coalition to Let the People Decide in 1989*, 125 Ill. 2d 332, 338-39 (1988). The reason for this is that these two Codes are " '[g]overned by one spirit and a single policy.' " *Id.* at 339 (quoting *People v. Maya*, 105 Ill. 2d 281, 286-87 (1985)). Consequently, this court must presume " 'that the legislature intended the enactments to be consistent and harmonious.' " *Id*. Section 3–1 of the Election Code provides, in relevant part, that "[e]very person (i) who has resided in this State and in the election district 30 days next preceding any election therein *** and who is a citizen of the United States, of the age of 18 or more years is entitled to vote at such election for all offices and on all propositions." 10 ILCS 5/3–1 (West 2008). Section 3–2(a) of the Election Code, in turn, provides that "[a] permanent abode is necessary to constitute a residence within the meaning of Section 3–1." 10 ILCS 5/3–2(a) (West 2008). Thus, under the voter-eligibility provisions of the Election Code, "residency" and "permanent abode" are synonymous (see *Pope v. Board of Election Commissioners*, 370 Ill. 196, 200 (1938)), and both are governed by the well-settled residency principles outlined above (see, *e.g.*, *id*.). This, then, raises the question: How can this court best construe the residency requirement in section 3.1–10–5(a) of the Municipal Code as to render it consistent and in harmony with the residency requirement contained in section 3–1 of the Election Code? The appellate court's answer was to assign them inconsistent and competing meanings. No. 1–11–0033, slip op. at 20-21. How, exactly, this fosters consistency and harmony is unclear, and the appellate court makes no effort to explain. The far better approach, we believe,

and the one that vindicates our obligation to construe the provisions consistently and harmoniously, is to presume that they have the *same* meaning, that to "reside[ ] in" means the same thing in section 3.1–10–5(a) of the Municipal Code as it does in section 3–1 of the Election Code.

Third, as helpful as the *in pari materia* doctrine is, it is not clear that it is necessary in this case, as we are faced not so much with related provisions of separate statutes as with a single statutory provision. Consequently, the more relevant canon of construction may be the one stating that "where the same, or substantially the same, words or phrases appear in different parts of the same statute they will be given a generally accepted and consistent meaning, where the legislative intent is not clearly expressed to the contrary." *Moran v. Katsinas*, 16 Ill.2d 169, 174 (1959). Again, section 3.1–10–5(a) of the Municipal Code states, in relevant part:

> "A person is not eligible for an elective municipal office unless that person is a qualified elector of the municipality and has resided in the municipality at least one year next preceding the election or appointment ***." 65 ILCS 5/3.1–10–5(a) (West 2008).

And again, to determine whether one is a "qualified elector of the municipality," article 3 of the Election Code must be consulted. Effectively, then, the voter eligibility standards from article 3 of the Election Code, including the residency standard, have been incorporated into section 3.1–10–5(a) of the Municipal Code. Thus, were we to say that residency means one thing in article 3 of the Election Code and something altogether different in section 3.1–10–5(a) of the Municipal Code, we would be creating an inconsistency not only between the two codes, but within section 3.1–10–5(a) itself–residency would mean one thing in the "qualified elector" clause, and something else just three words later in the one-year residency clause. There being no indication that the legislature intended any such inconsistency, we will not read it into section 3.1–10–5(a). Instead, we will presume that the legislature intended residency to mean the same thing each time it is referenced in section 3.1–10–5(a).

Of course, the appellate court did not see the statutory question this way. But its reasons for departing from over 100 years of settled

residency law are hardly compelling and deserve only brief attention. First, as already noted, the appellate court asserts that this court "has at least once noted the distinction between candidate and voter residency requirements." No. 1–11–0033, slip op. at 9. In support, the appellate court cites to this court's 1960 pronouncement that the residency requirements set forth in the Municipal Code " 'differentiate[d] between "electors" and those persons who may qualify for municipal office.' " No. 1–11–0033, slip op. at 9 (quoting *People ex rel. Moran v. Teolis*, 20 Ill. 2d 95, 104 (1960)). The intended implication, of course, is that this court has a history of defining residency differently as between candidates and electors. What the appellate court fails to mention is that the cited portion of *Moran* was referring solely to the statutory *time periods* in the respective local residency requirements (*i.e.*, 30 days for electors, one year for candidates), a "distinction" that appears on the face of the statute and says nothing about *how*, as opposed to *how long*, residency must be established.

The appellate court then spends five pages examining section 3.1–10–5(d) of the Municipal Code (65 ILCS 5/3.1–10–5(d) (West 2008)), which is somewhat mysterious given that this section in no way speaks to the definition of "residency." Enacted in 2007, section 3.1–10–5(d) provides:

> "If a person (i) is a resident of a municipality immediately prior to the active duty military service of that person or that person's spouse, (ii) resides anywhere outside of the municipality during that active duty military service, and (iii) immediately upon completion of that active duty military service is again a resident of the municipality, then the time during which the person resides outside the municipality during the active duty military service is deemed to be time during which the person is a resident of the municipality for purposes of determining the residency requirement under subsection (a)." 65 ILCS 5/3.1–10–5(d) (West 2008).

Far from resolving the question of what it means to "reside in" or be "a resident of" a municipality for purposes of section 3.1–10–5(a), section 3.1–10–5(d) begs that very same question. By its plain terms, section 3.1–10–5(d) speaks of someone who, though once a "resident," spent some amount of time "resid[ing]" somewhere else,

and now is "again a resident." The only way to construe this provision in any meaningful way is to know what the Municipal Code means by residency, something section 3.1–10–5(d) in no way speaks to. So rather than providing the elusive answer, this provision leaves us right back where we started: What does residency mean for purposes of section 3.1–10–5 of the Municipal Code?

By way of final thought on this question, we wish to point out that, while this court's traditional definition of residence may be plugged into the Municipal Code without creating any ambiguity or confusion, the appellate court's new and undefined standard promises just the opposite. Although adopting a previously unheard-of test for residency that would have applied to all future municipal elections, the court made no attempt to explain what its standard means. The only hint given by the appellate court is that, whatever its standard means, this candidate did not satisfy it. The appellate court never explained what it meant by "actually reside" or "actually live." Indeed, as its discussion of section 3.1–10–5(d) reflects, the entire appellate court opinion can be read as nothing more than an extended exercise in question begging, in which the appellate court sets forth the question to be answered as what it means to "reside" (No. 1–11–0033, slip op. at 11), and concludes that it means to have "actually resided" (No. 1–11–0033, slip op. at 21).

The difficulty of applying such a standard is immediately apparent. For instance, consider a Chicago resident who owns a second home in Florida and typically spends a month there every winter. Where is that person "actually living" or "actually residing" during the month when he or she is at the second home? Is such a person ineligible for municipal office unless he or she sleeps at the Chicago house every night for the year preceding the election? Is there a time limit with this test? Would a week at the second home be short enough but two months be too long? What about a Chicago resident whose job requires him to spend extended periods of time out of the country every year? Where is such a person "actually living" or "actually residing" when out of the country? Assuming without deciding that the appellate court was correct that the government service exception does not apply to candidates, consider the example of Representatives in Congress who often spend 4-5 days a week in Washington. If a Representative from a Chicago congressional district owns a

-17-

condominium in Washington, where is that representative "actually living" or "actually residing" when Congress is in session? Under the majority's test, would the candidate have been ineligible to run for mayor even during the time he was serving in Congress? The same confusion would arise with respect to State Representatives or State Senators who must spend considerable amounts of time in Springfield. Applying the traditional test of residency to all of the above examples leads to the commonsense conclusion that all would remain Chicago residents even when away. Under the appellate court's test, considerable doubt would arise as to whether *any* of these people could meet a residency test that requires one year of "actually living" or "actually residing" in the municipality. Once the practical implications of adopting a standard for residence that means "actually lives" or "actually resides" are considered, one can readily appreciate why such a standard has never been adopted and why the standard used in Illinois has endured for well over a century.

So where does all of this leave us? It leaves us convinced that, when determining whether a candidate for public office has "resided in" the municipality at least one year next preceding the election or appointment, the principles that govern are identical to those embodied in *Smith* and consistently applied in the context of determining whether a voter has "resided in" this state and in the election district 30 days next preceding any election. Thus, in assessing whether the candidate has *established* residency, the two required elements are: (1) physical presence, and (2) an intent to remain in that place as a permanent home. Once residency is established, the test is no longer physical presence but rather abandonment, the presumption is that residency continues, and the burden of proof is on the contesting party to show that residency has been abandoned. Both the establishment and abandonment of a residence is largely a question of intent, and while intent is shown primarily from a candidate's acts, a candidate is absolutely competent to testify as to his intention, though such testimony is not necessarily conclusive.

With these governing principles in mind, we now consider the Board's ruling. The first thing that must be observed is that the Board applied the very standard we prescribe above for determining residency. Given this, and given that we have already determined that

the Board's factual findings were not against the manifest weight of the evidence, we may immediately proceed to determining whether the Board's conclusion that the candidate met the residency requirement was clearly erroneous. A decision is "clearly erroneous" only when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 244 (2009). Having carefully reviewed the Board's decision, we are not left with a definite and firm conviction that a mistake has been committed.

Again, because it is uncontested that the candidate was a Chicago resident at least until January 2, 2009, when he resigned his office as Representative from the Fifth Congressional District of Illinois, the Board correctly determined that the relevant question was *not* whether the candidate had *established* residency in Chicago, but rather whether the objectors had proved by a preponderance of the evidence that the candidate had *abandoned* that residency at any time during the one-year period before the February 22, 2011, election. Only when abandonment is proven is residence lost. *Stein v. County Board of School Trustees*, 40 Ill. 2d 477, 479 (1968). On the question of abandonment, a party's intention is controlling. *Kreitz*, 125 Ill. at 195. Intention is determined both by a person's declarations and his acts. *Id*. A person's declarations of intent are not conclusive and may be disproved by his acts. *Id*. Once a residence has been established the presumption is that it continues, and the burden of proof is on the party claiming that it has been changed. *Moir's Estate*, 207 Ill. at 186.

After finding the facts as summarized at the outset of this opinion, the Board concluded that the objectors had failed to meet their burden of showing that the candidate had abandoned his residence. Specifically, the Board found that the preponderance of the evidence did not show the candidate had formed an intention to terminate his residence in Chicago or to establish his residence elsewhere. The candidate maintained significant contacts in and with the City of Chicago and the State of Illinois, including continuing ownership of real estate; continuing ownership of valuable personal property of kinds that a reasonable person would store at the place he deemed to be his permanent residence and to which he planned to return. The Board concluded that the candidate's absence from Chicago was solely for the purpose of permitting him to discharge what he

-19-

perceived to be a duty to serve the United States in the capacity of Chief of Staff to the President of the United States. Moreover, the Board found that the fact that the ending dates of the lease terms for the Woodley House and the Hermitage House were identical, showed that the candidate intended to return to the Hermitage House as soon as his service to the President was over. None of these findings are clearly erroneous.

This is a situation in which, not only did the candidate testify that his intent was not to abandon his Chicago residence, his acts fully support and confirm that intent. The candidate told several friends that he intended to serve as Chief of Staff for no more than 18 months or two years before returning to Chicago. The candidate has continued to own and pay property taxes on the Chicago residence while only renting in Washington, D.C. As set forth above, the ending dates for the Woodley House lease and the Hermitage House lease were identical and coincided with the end of the school year of the candidate's children. This supports an inference that the candidate intended to move back into the Hermitage House when the Woodley House lease ended. The candidate has continuously maintained an Illinois driver's license setting forth the Hermitage House as his address and has never obtained a Washington, D.C., driver's license. The candidate has continued to register his car at the Hermitage House address. The candidate registered to vote from the Hermitage House address in 1999 and has continuously voted from that address in every election through February 2010. Up and through 2010, the candidate did his banking in Chicago and had the Hermitage House address printed on his personal checks. The candidate left many personal items in the Hermitage House, including his bed, two televisions, a stereo system, a piano, and over 100 boxes of personal possessions. Although the candidate paid income taxes to the government of the District of Columbia, the candidate continued to pay state income tax in Illinois.

The objectors claim that, once a person rents out a residence, he or she has abandoned it as a matter of law. This is obviously incorrect, as it is directly contrary to *Smith*. Indeed, *Smith* makes clear that rental is merely one factor to consider in determining abandonment (*Smith*, 44 Ill. at 24), and the terms of the rental and the circumstances surrounding it must be considered. For instance, if an Illinois resident

accepts a permanent job with an out-of-state corporation, purchases a house in a new state, moves his or her family into the new house, moves all of his or her belongings out of the old house and into the new one, and then rents out the old house on a one-year lease with a right to renew, it clearly could be said that this was an abandonment of the Illinois residency. By contrast, the Board did not believe that this rental showed abandonment when the candidate took a position as Chief of Staff to the President of the United States (an inherently temporary position of national service), merely rented in Washington, D.C., left many personal belongings in the Chicago residence, and ensured that the lease term for the Chicago house ended at the same time as the lease on the Washington, D.C., house. The Board determined that, in this situation, the rental did not show abandonment of the residence. This conclusion was well supported by the evidence and was not clearly erroneous.

Given the record before us, it is simply not possible to find clearly erroneous the Board's determination that the objectors failed to prove that the candidate had abandoned his Chicago residence. We therefore reverse the decision of the appellate court and affirm the decision of the circuit court, which confirmed the Board's decision.

So there will be no mistake, let us be entirely clear. This court's decision is based on the following and *only on the following*: (1) what it means to be a resident for election purposes was clearly established long ago, and Illinois law has been consistent on the matter since at least the 19th Century; (2) the novel standard adopted by the appellate court majority is without any foundation in Illinois law; (3) the Board's factual findings were not against the manifest weight of the evidence; and (4) the Board's decision was not clearly erroneous.

Appellate court judgment reversed;
circuit court judgment affirmed.

JUSTICES FREEMAN and BURKE, specially concurring:

We join in the majority's decision to reverse the judgment of the appellate court. We do not, however, agree with the majority's reasoning.

The result in this case is in no way as clear-cut as the majority makes it out to be. The majority states that, in Illinois, "the legal meaning of residence has been settled for well over 100 years, not only in the very context that section 3.1–10–5(a) concerns (see *Smith*, 44 Ill. at 23-25), but in virtually every other setting in which this court has construed a legal residency requirement." Slip op. at 13-14. This is simply not true.

As this court has noted, the legal term "residence" does not "have a fixed and constant meaning" *Fagiano v. Police Board*, 98 Ill. 2d 277, 282 (1983)); see also Restatement of the Law, Second, Conflict of Laws §11, cmt. *k*, at 45 (1971) ("Residence is an ambiguous word whose meaning in a legal phrase must be determined in each case"); W. Reese and R. Green, *That Elusive Word, 'Residence,'* 6 Vand. L. Rev. 561, 580 (1953) (residence is "one of the most nebulous terms in the legal dictionary"); *Willenbrock v. Rogers*, 255 F.2d 236, 237 (1958) ("The words 'resident' and 'residence' have no precise legal meaning although they are favorite words of legislators.").

The majority bases its decision entirely on *Smith v. People ex rel. Frisbie*, 44 Ill. 16 (1867). As the appellate court correctly noted, the outcome in that decision turned solely on intent, a principle that is consistent with the legal concept of domicile. See *Hayes v. Hayes*, 74 Ill. 312 (1874). Unfortunately, *Smith* was not this court's last pronouncement on the issue. Later decisions, namely *Pope v. Board of Election Commissioners*, 370 Ill. 196 (1938), *Park v. Hood*, 374 Ill. 36 (1940), and *Clark v. Quick*, 377 Ill. 424 (1941), each define residence in terms of domicile *plus* a permanent abode. In other words, under these cases, intent alone is not enough to establish residency.

Suffice it to say, therefore, that this court has not always spoken clearly on what is meant by residency, and the majority should acknowledge this fact. This is why both sides in this dispute can contend that their respective positions are supported by decades of precedent. Indeed, contrary to the majority's assertions, the only thing

that is well established in this case is the confusion that has existed on this subject. The majority today now makes clear that residency for all purposes is the equivalent of domicile. The majority, therefore, should overrule those portions of *Pope*, *Park*, and *Clark* which hold to the contrary.

It is for this reason that the tone taken by the majority today is unfortunate. Because our own case law was, until today, unclear, it is unfair of the majority to state that the appellate court majority "toss[ed] out 150 years of settled residency law" (slip op. at 10), adopted a "previously unheard-of test for residency" (slip op. 17), or was engaged in a "mysterious" analysis (slip op. at 16). In order to properly address the parties' arguments, the appellate court had to reconcile this court's conflicting pronouncements on the question of residency. That court did the best it could without the benefit of a supreme court opinion which clarified the standards. By refusing to acknowledge the role our own case law has played in creating the dispute before us, the majority unwittingly adds credence to the inflammatory statements contained in the dissenting opinion below.

The dissenting justice below accused the appellate court majority of engaging in a "pure flight of fancy" (No. 1–11–0033, slip op. at 35, Lampkin, J., dissenting)), of "conjur[ing]" its result "out of thin air" (*id*. at 40), and of having a "careless disregard for the law" (*id*. at 41). The dissenting justice also stated that the result was a "figment of the majority's imagination"(*id*. at 39), based on the "whims of two judges" (*id*. at 42). In other words, the dissenting justice accused the majority of basing its decision on something other than the law.

When the appellate court's decision was announced, these accusations were repeatedly emphasized in the media (see, *e.g.*, *Judicial Arrogance*, Chicago Tribune, Jan. 25, 2011, at 14; *Rahm Ruling a Disservice to Voters*, Chicago Sun-Times, Jan. 25, 2011, at 21), thereby fueling the perception that the appellate court's decision was, in fact, based on extrajudicial considerations. The tone taken by the majority today, and the refusal to acknowledge conflicting case law, unfairly perpetuates that notion.

Spirited debate plays an essential role in legal discourse. But the majority opinion here and the appellate dissent cross the line. Inflammatory accusations serve only to damage the integrity of the judiciary and lessen the trust which the public places in judicial

-23-

opinions. The present case, one of obvious public interest, raises difficult questions regarding the legal concept of residency about which reasonable minds may differ. Indeed, as noted above, the meaning of the term "residency" has puzzled attorneys and judges since the term first appeared in the statute books. The majority and dissenting appellate court opinions illustrate the confusion that has long existed on this issue, which is the very reason for the difficulty in discerning what the General Assembly meant when it used the words "has resided in" in section 3.1–10–5(a) of the Illinois Municipal Code (65 ILCS 5/3.1–10–5(a) (West 2008)). There is no reason for the majority here to cast aspersions on the appellate court's motivations.

Former Illinois Supreme Court Justice Ben Miller, one of the most esteemed jurists to have served on this court, stated it well:

> "Judges often disagree about what result the law requires in a particular case. The existence of these disagreements, and the ability of our legal system to thrive on them, are virtues of the judicial process and of our system of government. The terms of the debate, however, must be framed by civility and respect, and not by suspicion and untruths. When rancor eclipses reason, the quality of the debate is diminished, the bonds of collegiality are strained, and the judicial process is demeaned. We cannot prescribe civility to members of the bar when our own opinions are disfigured by comments as offensive as those we have admonished lawyers for making. *** We should receive no less from our colleagues than we expect from lawyers who appear in our courts." *People v. Bull*, 185 Ill. 2d 179, 222 (1998).

Finally, it should be noted that today's decision will raise questions beyond the facts of this case. Because the court holds that residency has one settled meaning, and that meaning rests on a person's intent, today's decision will have implications for residency requirements for in-state tuition, residency requirements for municipal employees such as police officers and firefighters, residency requirements for school districts and other similar situations. This court should be prepared to address those issues as firmly and expeditiously as we have done today.

Because of the breadth of today's decision, we do not join the majority's holding that residency is the equivalent of domicile and that

intent, therefore determines residency, even in the absence of any physical presence. Rather, we would answer the narrow question that was actually raised by the objectors in this case: Does a person lose his permanent abode if the abode is rented during the relevant residency period? To that question we answer "no." *Smith*'s rule of intent was called into question by *Park*'s holding requiring a permanent abode in addition to domicile to maintain residency. Thus, despite the similarity in facts between this case and *Smith*, it remains an open question, in the wake of *Park*, as to whether a permanent abode is lost by renting it out. In the absence of explicit guidance from the legislature on this question, and because a candidate's access to the ballot is favored by law (see, *e.g.*, *McGuire v. Nogaj*, 146 Ill. App. 3d 280, 282 (1986) (access to the ballot "is not to be prohibited or curtailed except by plain provisions of the law")), we join in the judgment of the majority.