2020 IL App (1st) 181708-U

No. 1-18-1708

Order filed March 31, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| ANTHONY FIGUEROA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 51022 |
| | ) | |
| THE BOARD OF FIRE AND POLICE | ) | |
| COMMISSIONERS OF THE VILLAGE OF MELROSE | ) | |
| PARK, ILLINOIS, and RICHARD BELTRAME, Fire | ) | |
| Chief of the Village of Melrose Park, Illinois, | ) | Honorable |
| | ) | James M. McGing, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The decision to terminate the employment of a village firefighter for violating the ordinance that required the village to be his principal residence was not clearly erroneous.

¶ 2    Plaintiff, Anthony Figueroa, appeals the circuit court order affirming the decision of

defendant, the Board of Fire and Police Commissioners of the Village of Melrose Park, Illinois

(Board), to terminate Figueroa's employment as a firefighter for violating the residency requirement of the Village of Melrose Park, Illinois (Village). Figueroa asks this court to vacate the Board's decision and order his reinstatement with back pay.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                                    I. BACKGROUND

¶ 5    The Village employed Figueroa as a firefighter/EMT from 2003 to 2017. In that position, he worked 24-hour shifts, with 24 hours on duty and then 48 hours off duty. When he applied for and initially obtained the position, he was living at his mother's house, a two-flat located on 23rd Avenue in the Village. In 2004, he purchased a duplex on 18th Avenue in the Village and lived there for about four years. In 2008, he sold the duplex and moved into an apartment on Division Street in the Village. Figueroa terminated that apartment lease at about the time he got married in 2013. His wife was a Chicago Public School employee and was subject to a residency requirement to live in Chicago. Although his wife owned a home in Chicago and lived there since about 2001, Figueroa claimed that he moved back into his mother's Village home in 2013.

¶ 6    In April 2017, defendant Richard Beltrame, the Village fire chief, filed written charges against Figueroa, alleging that he had violated the Village's residency requirement by failing to maintain his principal residence in the Village. The charges alleged that Figueroa did not have any lease or rental agreement with his mother for his alleged use of her Village home, he and his wife were not legally separated or divorced, he provided money each month to his wife for living expenses for the Chicago home, and he did not own, lease or rent any property in the Village. The

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

charges asserted that Figueroa's claim that he was a current Village resident was not credible and his employment as a Village firefighter should be terminated.

¶ 7    At the hearing in October 2017 before the Board, Figueroa testified that he was raised in the Village since the age of five and had lived there for almost his entire life. When he got married in 2013, he spoke to Chief Beltrame about Figueroa and his wife's different residency requirements. According to Figueroa, Chief Beltrame responded that Figueroa had to have his main or primary residence in the Village but did not have to live there exclusively. Figueroa testified that while his wife lived in her Chicago house with three family members, he moved back into his mother's Village house, where he lived with several family members but had his own room. He kept a number of personal items at his mother's house, including his clothing, toiletries, Xbox, sports equipment, and other items he used on a regular basis. He used the bed that was already at his mother's house but bought some furniture for her house and paid a portion of the mortgage every month. He had no rental agreement at his mother's house, and the room he used was also used by his mother.

¶ 8    Figueroa testified that he intended to remain a resident of the Village. He and his wife looked to purchase a home in the Village, and his wife looked for work in the Village. Figueroa could not identify how many nights he had slept at his mother's Village house in February or March 2017 but estimated that he spent one or two nights a week at this mother's Village house on nights before his fire shifts started and the remainder of the time at the Village firehouse, his wife' Chicago house or sometimes out of town, noting that he traveled an average of two to four trips per month for about two days at a time. He acknowledged that there were certain periods of time when he had spent more time staying with his wife at her Chicago home, such as when she was trying to get pregnant near the end of 2015 and he gave her fertility shots, and when she

experienced complications from her pregnancy in 2016 and needed help. Their daughter, who was born in July 2017, lived in Chicago with his wife, and Figueroa helped her take care of their child. He went to therapy for marital problems related to the fact that he was not living with his wife.

¶ 9    Figueroa submitted numerous documents that listed his residence at his mother's Village address. These documents included his auto insurance policy, DirectTV bills, AT&T internet bills, FOID card and concealed carry permit, driver's license, EMT license, Illinois voter registration card, bank statements, credit union account, IRS 1099 forms for 2014 to 2016, a paycheck from part-time employer Bill Lane, Village paychecks, and the envelope that delivered his marriage certificate. He also submitted evidence of ATM withdrawals and debit card transactions to show that his daily life activities like grocery shopping, pumping gas, physical therapy, attending the movies, playing basketball, going to the gym, and eating at a restaurant, were focused in the Village.

¶ 10    On October 30, 2017, the Board issued its findings and decision, which terminated Figueroa's employment for failing to comply with the residency ordinance. Specifically, the Board found that, based on Figueroa's testimony, the documents submitted at the hearing, and the surrounding facts and circumstances, he did not occupy a residence in the Village as his principal place of residence and abode throughout his employment.

¶ 11    Figueroa filed a complaint for administrative review challenging the Board's decision to terminate him based on the residency violation. On July 12, 2018, the circuit court affirmed the Board's decision discharging Figueroa. The circuit court found that the Board's decision was not clearly erroneous because the evidence showed that, pursuant to the strict terms of the Village's residency requirement, Figueroa had not been a Village resident for over four years.

¶ 12    Figueroa timely appealed.

¶ 13                                    II. ANALYSIS

¶ 14     First, Figueroa argues that the Board improperly construed the Village's principal place of residence requirement to mean that the Village must be the employee's only residence. Figueroa argues that the analysis of this issue should be guided by *Maksym v. Board of Election Commissioners of the City of Chicago*, 242 Ill. 2d 303, 326 (2011), which stated that a person establishes his residency by showing physical presence and an intent to remain in that place as a permanent home; however, once residency has been established, the test is no longer physical presence but, rather, abandonment. *Id*. Residency is presumed to continue, and the contesting party has the burden to show that residency had been abandoned. *Id*. Both the establishment and abandonment of residency is largely a question of intent as shown by a person's acts and testimony. *Id*. According to Figueroa, consistent with *Maksym*, he established his principal residency in the Village by living and owning or renting his home there since he became a firefighter in 2003 and his "appearances" in Chicago after 2013 from time to time to be with his wife did not show that he intended to abandon his Village residency.

¶ 15     This issue involves statutory construction, which is a question of law that we review *de novo*. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 275 (2009). When construing a statute, our primary objective is to ascertain and give effect to the intent of the legislature. *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill. 2d 414, 424-25 (2002). The best signal of legislative intent is the language used in the statute, which must be given its plain and ordinary meaning. *Gillespie Community Unit School District No. 7 v. Wight & Co.*, 2014 IL 115330, ¶ 31. Where the statutory language is clear and unambiguous, the court must give it effect without resort to other tools of interpretation. *Exelon Corp.*, 234 Ill. 2d at 275. It is never

proper for a court to depart from the plain language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id.*

¶ 16    The residency requirement of the Village's Municipal Code (Code) provided that:

"[e]ach and every officer and employee of the Village, unless exempted by this Chapter, must be a resident of the Village as that term has been defined herein. Each and every officer must maintain resident status during his term of office. Each and every employee must maintain resident status during his or her period of employment." Village of Melrose Park, Ill., Municipal Code, ch. 2.52.020 (adopted 1997).

The Code defines "residence" as "a dwelling place used as a home, located within the corporate boundaries of the Village, and includes single-family dwellings, rental apartments and property, mobilehomes, condominiums, and dwelling units in multifamily, multidwelling or multipurpose buildings." *Id*. at ch. 2.52.010. A "resident" is defined as "a natural person who occupies a residence, as hereinbefore defined, as his or her principal place of residence and abode." *Id*.

¶ 17    *Occupy* generally means "to take or hold possession or control of" or "to reside in as an owner or tenant." Merriam-Webster's Collegiate Dictionary (10th ed. 1998). *Principal* generally means "most important, consequential, or influential: chief." *Id*. Giving the statutory language its plain and ordinary meaning, the Village's residency requirement clearly and unambiguously provided that Figueroa had to live within the boundaries of the Village in a home that was his primary or most important residence throughout his period of employment. Contrary to Figueroa's argument on appeal, the record establishes that the Board did not erroneously construe the ordinance to mean that he could not have more than one residence.

¶ 18    Furthermore, this court previously rejected Figueroa's argument that, pursuant to *Maksym*, defendants bore the burden to show that Figueroa intended to abandon his established status as a resident of the Village. In *Cannici v. Village of Melrose Park*, 2019 IL App (1st) 181422, ¶¶ 38-44, this court construed the same Code provision at issue. *Cannici* explained that the analysis in *Maksym* had considered whether the mayoral candidate had abandoned his established Chicago residency because the Illinois Municipal Code (65 ILCS 5/1-1-1 *et seq.* (West 2010)) did not clearly define resident or residency. *Cannici*, 2019 IL App (1st) 181422, ¶ 42. The Village's Code, however, "clearly defines resident and residence, and it requires its employees to maintain their status as residents during their employment." *Id.* ¶ 43. Consistent with *Cannici*, "we find no reason to depart from the plain language by reading into the ordinance definitions and tests drawn from other cases that conflict with the clearly expressed legislative intent." *Id.* We conclude that the Board properly interpreted the residency requirement of the Code.

¶ 19    Second, Figueroa argues the evidence established that the Village was his principal residence because throughout his 14 years of employment as a Village firefighter he spent the overwhelming majority of his time residing in his mother's home in the Village despite his appearances in Chicago from time to time to be with his wife in her Chicago home.

¶ 20    This issue presents a mixed question of fact and law, which we review under the clearly erroneous standard. *Thomas v. Chicago Transit Authority*, 2014 IL App (1st) 122402, ¶ 38 (this standard applies when the facts are admitted or established, the controlling rule of law is undisputed, and the issue is whether the facts satisfy the legal standard). "An agency's decision is 'clearly erroneous' when the reviewing court is left with a firm and definite conviction that the agency has committed a mistake." *Id.*

¶ 21    After reviewing the record, we conclude that the Board's decision to terminate Figueroa's employment for violating the residency requirement was not clearly erroneous. The evidence established that, after Figueroa's marriage in 2013, he terminated his rental agreement for his Village apartment and did not live in the Village as his principal residence. Specifically, he spent only one or two nights per week at his mother's Village home on nights before his fire shifts started. Although he kept a few personal items in a room at his mother's home, that room was not exclusively his. He had no written rental agreement concerning his use of his mother's home, and there was no evidence that he paid rent. Although he testified that he contributed to the mortgage payments on his mother's home, that testimony was not supported by any documents or other witness testimony. Furthermore, the documents Figueroa submitted merely showed that he used his mother's Village home as a mail drop. In contrast, he spent a significant amount of time living in a Chicago home with his wife and child. Figueroa was not separated or divorced from his wife, and he testified that he spent a lot of time with his family caring for his wife and their child. His wife, who was subject to a Chicago residency requirement as a Chicago Public School employee, owned the Chicago home and there was no evidence that she attempted to sell that property.

¶ 22                                      III. CONCLUSION

¶ 23    For the foregoing reasons, we affirm the judgment of the circuit court that affirmed the Board's decision to terminate Figueroa's employment.

¶ 24    Affirmed.